**Wilbur L. LOVELACE, Appellant,**

v.

**SHERWIN–WILLIAMS COMPANY, Appellee.**

**No. 80–1879.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 7, 1981.

Decided June 15, 1982.

---

234

Samuel M. Millette, Charlotte, N. C. (Ernest S. DeLaney, III, DeLaney, Millette, DeArmon & McKnight, P. A., Charlotte, N. C., on brief), for appellant.

Harvey L. Cosper, Jr., Charlotte, N. C. (Golding, Crews, Meekins, Gordon & Gray, Charlotte, N. C., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and PHILLIPS and ERVIN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

The plaintiff sought damages from his former employer for an alleged violation of the Age Discrimination in Employment Act (ADEA). The plaintiff's claim, centered on his demotion from a position as store manager, was submitted to a jury which returned a verdict in his favor. Thereafter, however, the district judge granted the de-

fendant's motion for judgment notwithstanding the verdict. The plaintiff appealed, and we affirm.

## I

In November 1978, Wilbur Lovelace, then age 55, was demoted from his position as manager of the larger of two Sherwin-Williams stores in Asheville, North Carolina. The store, which retails paint and related decorator and hardware products, was then one of approximately 1400 Sherwin-Williams stores across the nation and one of the two largest in an "Asheville district" consisting of sixteen stores in parts of North Carolina, Tennessee and Virginia. The manager of this district since 1974 had been R. L. Cardwell. Cardwell was in turn supervised by G. R. Davenport, the manager of a mid-south region consisting of 139 stores including the sixteen in the Asheville district.

At the time of his demotion, Lovelace had been employed by Sherwin-Williams for over 30 years and had managed the Asheville store for the past 23. It is undisputed that until late 1976 Sherwin-Williams was entirely satisfied with Lovelace's performance as manager. Lovelace introduced into evidence a January 1977 appraisal prepared by Cardwell which rated Lovelace's "overall performance" as of "high standard." [1] With the exception of notations that Lovelace needed to work more closely with his staff and that Lovelace had responded negatively and vocally to a then-new compensation program for store managers, the appraisal was generally quite laudatory. Indeed Cardwell noted in the evaluation that Lovelace was "promotable now" and could function well as the district manager. Lovelace testified that he had in fact been offered, but had rejected, this latter job in 1974 before the position was awarded to Cardwell.

Lovelace also produced at trial sales and profit records for the stores in the district for the period from 1970 through 1978. These records showed that during this time the Asheville store's net sales increased every year but one (1975) and that the store showed a net profit every year but one (1977). In 1977, the store lost $5,000 on net sales of over $873,000.[2] The same sales records also showed, however, that although the Asheville store's profits increased from 1970 to 1974, its profit trend was in unmistakable decline for the four following years. On this point, the defendant brought out that the same records showed that by 1978 the Asheville store's profit to inventory ratio and profit to total sales ratio were the lowest of any of the 29 similarly-sized stores in the mid-south region.

Lovelace also testified that in mid-1977 Cardwell began visiting the Asheville store much more frequently than in the past. Lovelace asserted that Cardwell simultaneously began a campaign of fault-finding and report-writing to provide support for the later demotion. Lovelace testified, for example, that Cardwell instructed him to complete store maintenance projects that were impossible given the available staff and complained about problems, such as customer complaints, that did not exist. Lovelace also testified that Cardwell created a morale problem among employees by speaking with them individually about store problems.

The defendant produced in rebuttal what the district court characterized as "overwhelming" evidence of a legitimate reason for Lovelace's demotion. Cardwell agreed that in mid-1977 he began visiting the Asheville store more frequently, for the purpose of discovering and treating the causes of the then-evident downward trend

---

1. The "high standard" rating is the second highest of four, falling below "excellent" and above "standard." The appraisal stated that Lovelace handled the $800,000 operation and staff of eleven with apparent ease, was able to make the "hard decisions," and had "no problems" in supervising. Special note was made of Lovelace's selling ability.

2. Lovelace testified that he was never able to pinpoint the causes of this loss. The sales records show that every store in the district suffered a decrease in profits that year, although only one other store actually lost money.

in profits. He testified that during these visits he saw unmistakable signs of what he considered to be poor organization and management. For example, he found employees unable to handle many business inquiries and generally unaware of national sales promotions in progress; store aisles usually cluttered and shelves often messy and inadequately stocked; items frequently not visibly priced; files and bulletin boards containing obsolete materials; books and records poorly maintained; overall housekeeping poor; and Lovelace with an "attitude" problem about undertaking proposed changes.

In August of 1977, Cardwell prepared a four-page action plan, introduced into evidence, calling for Lovelace to tackle these and other problems. Cardwell testified that a month later most of the problems had not been addressed and some had actually worsened. In January of the next year Cardwell prepared another action plan, requiring Lovelace to recommend plans to improve sales in two specific areas, equipment and art supplies, that had been particularly slow. Lovelace never prepared these recommendations. On another occasion, the company initiated a target account program known as "MAP," with every manager required to select 10 prospective accounts, to identify specific problems faced in selling each account, and then to make initial contact with each of the ten. Lovelace's report was submitted a month and a half late and simply listed ten potential customers without any discussion.

In the spring of 1978, Davenport asked Cardwell to rank comparatively, based on seven different criteria, each of the store managers in the Asheville district.[3] Cardwell's opinion of Lovelace's performance had changed dramatically from that expressed in the January 1977 appraisal. Cardwell ranked Lovelace no higher than 12th in any of the seven categories and last overall.

Shortly thereafter Cardwell used one of his visits to the store to interview Lovelace's staff. Cardwell testified that he found the employees still unaware of sales promotions and generally unsure of their specific duties. He also heard repeated complaints about the store's disorganization and found employee morale dangerously low. One employee, newly transferred to the position of outside sales representative, was particularly upset that Lovelace would not train him for his new job, despite specific instructions from Cardwell to do so. This employee eventually requested a transfer from the store.

In early July, without notice to either Lovelace or Cardwell, the Asheville store was audited. Expenses were found to be $21,000 over budget and $54,000 greater than the year before. The report noted that internal operations needed the personal attention and follow-up of the store manager, as many of the problems found had been listed in the audit of the previous year. Cardwell testified that the audit findings reinforced his opinion that organization and management in the store were not improving.

Later that same month, Cardwell asked Davenport, to whom he had already mentioned problems in the Asheville store, to visit and observe the store's operations. Davenport, then in his mid-fifties, spent a full day studying the store and interviewing employees. He testified that he too found problems in supervision, housekeeping and merchandising, as well as widespread employee dissatisfaction. He discussed these problems briefly with Lovelace and soon thereafter addressed the three major problems in a letter. In this letter Davenport first criticized Lovelace's attitude and specifically his inability to accept suggestions and orders from his superiors. Second, Davenport indicated that organizational problems had reached a point that Lovelace risked losing total control of the store. Third, Davenport criticized Lovelace's fail-

3. These criteria were retail sales ability, sales ability and account development, gross profit, operations and internal control, store appear- ance, personnel handling, and business planning.

ure to communicate with or train his staff. The letter concluded, "Bill, you must get control again of the Asheville store as we cannot wait for disaster to hit and then go to work to improve."

In October the outside sales representative at the store asked to be relieved of his position, largely because of dissatisfaction with Lovelace. Cardwell then talked with Davenport about using the opportunity to move Lovelace, still respected as a salesman with a good reputation in the community, into the sales representative position and replace him with a new manager. Cardwell wanted the replacement to be Laurence Atkins, then manager of a store in Waynesville, North Carolina. Cardwell had ranked Atkins first overall among all managers in his comparative ratings earlier that year.[4]

Davenport agreed to the change. He testified that he then made special arrangements to provide Lovelace with a salary well above the maximum scale for the outside sales representative position. He also authorized a bonus program that would allow Lovelace to earn a salary close to what he had received as manager. Lovelace was told of the change in November and quickly agreed to accept the new job. On December 1 Atkins officially took control. He was then 49 years old, six years younger than Lovelace and had recently undergone surgery for removal of a cancerous bladder. He was replaced at the Waynesville store by a man of 50, or one year older than himself. At the time of the change in Asheville, 6 of the 16 managers in the district were over 50.

Atkins testified at trial that on becoming manager he found problems at the store of the kind testified to by Cardwell and Davenport. He stated, for example, that many employees were unaware of their responsi-

bilities and required retraining, that price listing guides and records were outdated, and that housekeeping and product organization were in disarray. Two other employees also corroborated the testimony of Cardwell, Davenport, and Atkins. One testified that he had repeatedly refused to serve as assistant manager under Lovelace, but was willing to accept the position once Lovelace was replaced.

In the months following his demotion, Lovelace twice asked for and received meetings with Cardwell and Davenport to discuss the reasons for his demotion. At each the two supervisors gave the same explanations offered at trial. At trial Lovelace offered explanations for most of these shortcomings about which his supervisors complained. In addition to denying morale or customer complaint problems, for example, Lovelace testified that the audit in 1978 was no worse than in past years when he was highly rated, that he had previously trained the outside salesman as an inside salesman and was not required to provide any additional training, and that he had not completed the MAP assignment because of other work requirements but that he did discuss the program with a different company official while on his vacation.

In 1979, Atkins' first year as manager, the store's profits doubled. As marketing representative, Lovelace led the district with sales of almost $350,000 but earned approximately $7,000 less than in 1978. He resigned in mid-1980.

## II

■ The dispositive issue is the propriety of granting judgment n. o. v. for the employer-defendant in this ADEA jury case.[5] Resolving it requires (a) identifica-

---

4. The January 1977 appraisal of Lovelace notes that Lovelace himself recommended Atkins as a potential replacement as manager in Asheville.

5. The district court granted judgment n. o. v. on the general basis that the evidence was insufficient to permit the jury to find age discrimination. The full details of that assessment are not revealed on the record, but we

review the sufficiency of the evidence under the same standard and independently of that assessment. 9 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2524 (1971).

The trial judge intimated some concern that perhaps no violation was established as a matter of law because the evidence showed that the claimant was not replaced by a *person* outside the protected age group. Defendant conceded on oral argument that on current

tion of the substantive elements of the particular ADEA claim asserted, hence of the specific burdens of production put to test by the motion made in this case; (b) identification of the appropriate standard for assessing the evidence on a defendant's motion for directed verdict or judgment n. o. v. in this ADEA case; and (c) application of the appropriate standard to the particular evidence adduced in light of the production burdens borne.

### A.

In identifying the essential elements and means of proof of an ADEA claim this circuit has heretofore drawn approvingly on Judge Campbell's analysis for the First Circuit in *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir. 1979). *See Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1113 & n.2 (4th Cir. 1981); *Smith v. University of North Carolina*, 632 F.2d 316, 334–35 (4th Cir. 1980); *Smith v. Flax*, 618 F.2d 1062, 1066 & n.3 (4th Cir. 1980). *Loeb*'s essential value lies in its guidance for transposing to the ADEA context the substantive elements and the corresponding proof scheme developed by the Supreme Court for circumstantially proving a "disparate treatment" claim of intentional race or sex discrimination under Title VII. In performing this useful service, the *Loeb* court in turn necessarily drew upon the line of then extant Supreme Court decisions which, starting with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), had continued to elaborate and refine the substantive nature of the Title VII intentional discrimination claim and its means of proof by indirect or circumstantial evidence.[6] Since *Loeb* was decided, the Supreme Court has once again spoken helpfully to the subject in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1980).

Without attempting here a detailed exegesis of these primary authorities, we can now deduce from them and from general procedural doctrine the following principles related to the substantive elements of an ADEA claim and the sufficiency of the evidence required in a jury trial to survive a defendant's challenge by motion for directed verdict or judgment n. o. v.[7]

■ 1. The substantive elements of the claim—without regard to attempted modes of proof—are (a) that an employee covered by the Act (b) has suffered an unfavorable employment action by an employer covered by the Act (c) under circumstances in which the employee's "age was a determining factor" in the action in the sense that " 'but for' his employer's motive to discriminate against him because of his age, he would not [have suffered the action]." *Spagnuolo*

---

authority this does not constitute an independent basis for the judgment. *See, e.g., McCorstin v. United States Steel Corp.*, 621 F.2d 749, 753–54 (5th Cir. 1980); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012–13 (1st Cir. 1979). We agree that this is not an essential legal element of the ADEA claim, and do not rely upon it. Whether the absolute and relative ages of claimant and replacement may be factually relevant to the discrimination issue is, however, a different matter. *See note 13, infra.*

6. Principally, *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

7. The process must be one of deduction just as was the First Circuit's process in *Loeb* where the undertaking was to transpose the proof scheme devised for the orderly assessment by trial judges of evidence in a Title VII bench trial into guidelines for submitting an ADEA case to the jury under appropriate instructions. Our undertaking is to transpose the bench trial proof assessment scheme, as adapted for jury submission in *Loeb*, into principles controlling evidence sufficiency rulings in the ADEA jury trial context. We have not previously had occasion to address it systematically with benefit of *Burdine*'s most recent clarification of the bench trial principles. *Loeb*, decided before *Burdine*, and directly concerned with jury instruction problems, only alluded briefly to the related problem in dictum. 600 F.2d at 1016. Justice Powell's opinion for a unanimous Court in *Burdine* offers the clearest conceptual guidelines yet provided for making proper transposition of *McDonnell-Douglas* proof scheme principles from the bench trial context to rulings on evidence sufficiency in the ADEA jury trial, and we rely mainly on its analysis.

*v. Whirlpool Corp.*, 641 F.2d at 1112 (citing to *Loeb*, 600 F.2d at 1019).

2. Where—as here, and ordinarily—coverage and unfavorable action are not disputed, the dispositive and only issue is the difficult, but narrow, motivational one: whether the employee "was [treated unfavorably] because of his age." *Loeb*, 600 F.2d at 1017. This may of course be proved under ordinary principles of proof by any direct or indirect evidence relevant to and sufficiently probative of the issue, *see id.* at 1018, without resort to any special judicially created presumptions or inferences related to the evidence.

3. But because of the comparable remedial purposes of the two Acts and the comparable difficulty under both of proving discriminatory motivation, the judicially created proof scheme for Title VII cases featuring a rebuttable factual presumption favoring claimants in the initial stages of proof is appropriate—properly adapted—for application in ADEA litigation. *Smith v. Flax*, 618 F.2d at 1066 n.3; *Loeb*, 600 F.2d at 1014–16; *see also Burdine*, 450 U.S. at 252 n.4, 258, 259, 101 S.Ct. at 1093 n.4, 1096, 1097 (comparable applicability suggested by citations to *Loeb* ).

4. As adapted for application to jury trial of an ADEA demotion[8] case, this presumption-centered means of proof operates as follows: (a) Plaintiff may establish a "prima facie case" by evidence (i) that he was at the time of demotion "performing his job at a level that met his employer's legitimate expectations" and (ii) that following his demotion his employer sought someone to perform the same work. *Loeb*, 600 F.2d at 1014; *see also Smith v. University of North Carolina*, 632 F.2d at 332. (b) The effect of this "prima facie case" is that of a rebuttable factual inference or presumption which, if not rebutted, suffices at least to require submission of the motivational issue to the jury. *See Burdine*, 450 U.S. at 254, 255 & nn. 7, 8, 101 S.Ct. at 1094 & nn. 7, 8. (c) Having this effect, it necessarily has the further effect of shifting to the defendant the burden of producing evidence on the issue. *Id.* at 254, 101 S.Ct. at 1094. This burden "is to rebut the presumption by producing evidence that the plaintiff was [disfavored] . . . for a legitimate, nondiscriminatory reason." *Id.* at 255, 101 S.Ct. at 1094. It is not a burden of persuasion, but is one that may be carried by "the introduction of admissible evidence" of an explanation that would be "legally sufficient to justify a judgment for the defendant." *Id.* at 254–55, 256–57, 101 S.Ct. at 1094, 1095–96. (d) The effect of a failure by the defendant to carry this burden of production is at least to require submission of the issue to the jury under a binding instruction in plaintiff's favor subject only to a credibility determination.[9] (e) On the other hand, the direct effect of carrying the defendant's production burden is to "destroy[ ] the legally mandatory inference." *Burdine*, 450 U.S. at 255 n.10, 101 S.Ct. at 1095 n.10. This "destruction" has two critical procedural consequences. First, it precludes, on this state of the evidence, a directed verdict or peremptory instruction subject to credibility determination in plaintiff's favor. *See id.* Second, it re-casts the dispositive motivational issue at "a new level of specificity." *Id.* at 255, 101 S.Ct. at

---

**8.** For purposes of this analysis, demotion, discharge, refusal to promote and like actions affecting employees in place are essentially of a piece. They differ most critically from the refusal to hire decisions for which the *McDonnell-Douglas* presumption was originally devised in relation to the "basically qualified" predicate for the prima facie case. This has created a rather difficult problem of adaptation. *See Loeb*, 600 F.2d at 1013, 1014 (adapting to discharge claim).

**9.** This much is implicit from Justice Powell's analysis in *Burdine*, 450 U.S. at 254, 101 S.Ct.

at 1094 ("If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case."). Whether under any circumstances a directed verdict for plaintiff rather than merely a peremptory instruction dependent upon credibility determination would be appropriate we need not now consider. *See Loeb*, 600 F.2d at 1015; *and see generally* 9 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2535 (1971) (directing verdict for party having burden of persuasion).

1095. That issue has now become narrowly whether, considering only the two reasons proffered by the opposing parties, the decision to demote claimant would not have been made but for defendant's motive to discriminate against him because of his age. *See Wright v. National Archives and Records Service*, 609 F.2d 702, 716 (4th Cir. 1979). As to this recast motivational issue, the plaintiff has once again the burden of production—now merged with the ultimate burden of persuasion on that issue which has never shifted. *Burdine*, 450 U.S. at 253, 256, 101 S.Ct. at 1093, 1095. (f) In consequence of this new production burden—and its corollary risk—the plaintiff must be given an opportunity directly to counter the defendant's evidence of the specific reason for the action with evidence that the reason given is "pretextual" or "not the true reason." *Id.* at 256, 101 S.Ct. at 1095. This may take the form of new evidence designed directly to attack the credibility of the defendant's specific explanation or simply to prove that, as against that specific reason, age is the "more likely" explanation. *Id.* Because destruction of the original presumption does not destroy the inherent probative force of evidence earlier introduced by the plaintiff to invoke it, that evidence too, as well as evidence elicited by the plaintiff in cross-examination, may be taken into account in determining whether plaintiff has carried this ultimate production burden. *See id.* at 255 n.10, 101 S.Ct. at 1095 n.10 (all such evidence proper for consideration by trier of fact in Title VII case). (g) The effect of carrying this ultimate production burden is to require submission of the motivational issue to the jury under proper instructions. The effect of a failure to carry it is to compel dismissal of the claim upon a proper motion for directed verdict or judgment n. o. v.

 5. The net effect of all this upon the role of the trial judge in ruling upon an evidence sufficiency motion at the conclusion of all the evidence in the jury trial of an ADEA case [10] can now be summarized. Though consideration and ruling on such a motion involves a unitary mental process, it will in logic address sequentially the different production burdens above described that are put in play by the evidence. (a) The first question is whether plaintiff's evidence may have carried the original production burden without need to invoke the *McDonnell-Douglas* presumption. This may have occurred, for example, through direct evidence of a stated purpose to disfavor because of age, or possibly through the cumulative effect of indirect evidence having sufficient probative force independent of the presumption's meager predicates to warrant submission of the motivational issue. *Cf. Loeb*, 600 F.2d at 1018. If this is the judicial assessment, inquiry of course ceases, no further production burdens are put in play, and the motion can be denied. If, on the other hand, the plaintiff's evidence fails even to support the unadmitted predicates of the presumption so that it may not be invoked to carry this original burden, inquiry similarly ends and the motion can be granted. (b) If the plaintiff's evidence supports the predicates of the presumption without regard to any additional probative force the evidence may have, inquiry must then proceed to whether the defendant has carried the production burden of rebutting the presumption by "admissible evidence" that is "legally sufficient" as justification. *See Burdine*, 450 U.S. at 255, 258, 101 S.Ct. at 1094, 1096; *Loeb*, 600 F.2d at 1016 & n.16. (c) If the defendant's evidence fails to carry this burden, inquiry ceases. The plaintiff is entitled at least to a peremptory instruction of liability subject only to a credibility determination.[11] If, on the other hand, the defendant's evidence carries this burden so that the presumption's force is dispelled, inquiry must proceed to the plaintiff's reacquired production burden. (d) This burden

---

10. Of course, in an appropriate case, where the evidence failed even to invoke the presumption, directed verdict would be appropriate at the conclusion of claimant's case-in-chief. *See Loeb*, 600 F.2d at 1016.

11. *See* note 9, *supra*.

relates again to the motivational issue but now as recast by the defendant's proffered explanation into the more specific form whether as between the plaintiff's age and the defendant's proffered reason, age is the "more likely." In assessing whether this recast burden of production has been carried, the court may properly consider plaintiff's evidence offered to establish the dispelled presumption along with any designed to show defendant's proffered explanation to be a pretextual one. If the burden is carried, the case is for the jury under proper instructions defining the motivational issue as ultimately framed at the "new level of specificity," *id.*, created by the defendant's rebutting evidence. If this ultimate burden is not carried the defendant's motion should of course be granted, even though the plaintiff's original burden of production was carried by force of the presumption.[12]

The next problem is the standard by which the sufficiency of the evidence on the ultimate motivational issue is to be assessed, and to that we now turn.

### B.

Reflecting a general difficulty encountered by all courts, *see* 9 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2524, pp. 545–47 (1971), we may not have been altogether consistent in our formulations of the standards by which evidence in civil actions is to be assessed for its sufficiency to support a jury verdict. *See id.* nn. 46, 48, 50. This may reflect no more than semantic lapses that have no demonstrable effect on results, or it may reflect the fact that different formulations are appropriate depending upon the nature of the factual issues and the nature of the evidence offered in their support that are being assessed. *See generally* Cooper, *Directions for Directed Verdicts: A Compass for Federal Courts*, 55 Minn.L.Rev. 903 (1971).

Be all that as it may, it is fortunate for our immediate purposes that some of our most careful formulations have been stated and applied in cases where, as here, the dispositive issue was one of causation—of which motive for challenged action is simply one species—and the evidence offered to prove it (all questions of credibility aside) was wholly circumstantial. In such cases the question of sufficiency goes simply to the reasonableness of drawing the necessary inference of causation from the indirect evidence, and on that specific matter there is in this circuit powerful precedent upon which we can with assurance draw. Three opinions command particular respect for the care and cogency of their analysis.

In *Ralston Purina Co. v. Edmonds*, 241 F.2d 164, 168 (4th Cir. 1957), Judge Sobeloff, finding insufficient the circumstantial (and opinion) evidence offered to prove the necessary causation in a products liability case, put it that only that evidence "which shows a 'probability' and not a mere 'possibility' " would suffice to allow jury consideration.

In *Ford Motor Co. v. McDavid*, 259 F.2d 261 (4th Cir. 1958), Judge Haynsworth, finding insufficient the circumstantial evidence of causation in a manufacturer's negligence case, expressed essentially the same thought. After conceding that "it is the province of the jury to resolve conflicting inferences from circumstantial evidence," he pointed out that "[p]ermissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Id.* at 266.

Again, in *Wratchford v. S. J. Groves & Sons Co.*, 405 F.2d 1061, 1066 (4th Cir. 1969), Judge Haynsworth, this time finding conflicting inferences of the cause of personal injury "equally probable," hence for jury resolution, nevertheless again emphasized

12. It is at this point that one of claimant's main contentions on appeal fails. The contention is that once the prima facie case has originally been established, the case must of necessity be submitted to the jury. This is simply wrong as a matter of fundamental procedural principle. *See Houser v. Sears, Roebuck & Co.*, 627 F.2d 756 (5th Cir. 1980).

"reasonable probability" as the proper test of sufficiency of circumstantial evidence to support the necessary inference. "The relevant question ... is ... whether a jury might reasonably conclude from the evidence that [the necessary] inference was more probable than the [sole conflicting] inference. . . ." *Id.* at 1066. Or, more succinctly, "if the inference sought to be drawn lacks substantial probability, any attempted resolution of the question may well lie within the area of surmise and conjecture," *id.*, so that the issue should not be submitted for jury consideration.

This emphasis, where causation is dispositive, upon "probability," "reasonable probability," "substantial probability" rather than mere "possibility" as the proper test simply bespeaks the special danger that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere "possibilities," by impermissible but understandable resort to such factors as sympathy and the like. It is of course precisely to guard against this danger that the burden of producing rationally probative evidence—and the corresponding risk of nonproduction—is placed upon claimants and subjected to the ultimate jury control devices of directed verdict and judgment n. o. v. *See Brady v. Southern Railway Co.*, 320 U.S. 476, 480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943) (to guard against "the mischance of speculation over unfounded claims"); *Galloway v. United States*, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1942) (to insure that "speculation be not allowed to do duty for probative facts"). The special danger in the causation context invites and justifies the special emphasis.

We are therefore satisfied that the test of evidentiary sufficiency expressed and applied in these cases turning on proof of physical causation is the appropriate one to apply to the dispositive motivational cause issue in ADEA jury cases. To its application in the instant case we now turn.

## C

As indicated in Part II A, the logical starting point in ruling upon the defendant's motion for judgment n. o. v. is to consider whether claimant may have carried his original production burden on the motivational issue without need for resort to the *McDonnell-Douglas* presumption with all its ensuing complexities. This might have been done either by direct evidence, *see Spagnuola v. Whirlpool Corp.*, 641 F.2d at 1113; *Loeb*, 600 F.2d at 1014 n.12, or by indirect evidence whose cumulative probative force, apart from the presumption's operation, would suffice under the controlling standard to support as a reasonable probability the inference that but for claimant's age he would not have been demoted. *See Loeb*, 600 F.2d at 1017 & n.18.

There was no direct evidence here as there was, for example, in *Spagnuola*, and claimant does not seem seriously to suggest that there was.

Neither was there sufficient indirect evidence independent of the presumption's force, taking into account all that adduced by both direct and cross-examination and for whatever specific purpose offered. *See Burdine*, 450 U.S. at 255 n.10, 101 S.Ct. at 1095 n.10.

■■■ Taken all together, the evidence came, in summary, only to this. At age 55—mid-way the protected age group—after working for defendant for 30 years and managing its Asheville store for 23 of those years, claimant was relieved as store manager in late 1978, replaced by a fellow employee who, at 49, was only six years younger, and demoted to a lower paying job as sales representative.[13] Until late 1976 his

13. As indicated, *see* note 5, an ADEA claim involving replacement by another does not require as a matter of law proof that the other was outside the protected age group. But absolute and relative ages of the claimant and his replacement have obvious relevance in assessing whether a factual inference of age discrimination is permissible. We agree with the First Circuit that

employer had been entirely satisfied with his performance as manager, as evidenced by a January 1977 official appraisal. From 1970 through 1978, while he was store manager, the employer's records revealed that the store's net sales increased every year but one (1975) and a net profit was realized every year but one (1977), although the same records showed that beginning in 1974 the store's profit trend was steadily downward and that by 1978 its profit to inventory and profit to total sales ratio were the lowest in his region.[14] In mid-1977 higher management began more frequent visits to the store and finding more fault with claimant's management of the store; in claimant's view, began to create morale problems among employees by discussing store problems and began requiring correction of deficiencies whose existence claimant would not then or later concede. Conspicuous by its

absence from plaintiff's attempted proof was any substantial evidence, *see Houser v. Sears, Roebuck & Co.*, 627 F.2d 756, 758 (5th Cir. 1980), that the employer was engaged in a general youth movement of which the claimant may have been one victim.[15]

Assessed independently of the presumption, we are satisfied that this circumstantial evidence does not suffice to support as a reasonable probability the inference that but for claimant's age he would not have been demoted. Without benefit of the presumption, age simply exists on this evidence as one of any number of possible reasons—including poor business judgment by the employer, *see Loeb*, 600 F.2d at 1012 n.6; *Bishop v. Jelleff Associates*, 398 F.Supp. 579, 593 (D.D.C.1974)—for the demotion. On this basis to find age a determinative cause could only be by outright conjecture and not by any rational assess-

---

> Replacement of a 60 year old by a 35 year old or even a 45 year old within the protected class would be more suggestive of discrimination than replacement of a 45 year old by a 42 year old within the protected class or a 39 year old outside it.
> *Loeb*, 600 F.2d at 1013 n.9.

**14.** Though it is axiomatic that in ruling on this motion, courts are to consider the evidence in the light and with all inferences most favorable to the party opposing the motion, they should do so on the basis of all the evidence, not just that favorable to the non-mover. *See Grooms v. Minute-Maid*, 267 F.2d 541, 543 (4th Cir. 1959); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970); *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc).

Particularly where, as here, unfavorable evidence (the low performance indicia) derives from unchallenged documentary sources relied upon in other respects by the non-mover, it is particularly appropriate to take it into account in assessing the reasonableness of the inference for which the non-mover seeks support in those sources.

**15.** Circumstantial evidence of a general "youth movement," or of a policy to get rid of older employees first in a general workforce reduction, or of a general plan to turn over management periodically to infuse "new blood," has obvious inferential force. *See Smith v. Flax*, 618 F.2d at 1066 (potential probative force recognized).

Claimant here adduced some evidence apparently designed to show a general youth movement or a calculated pattern of more favorable treatment for younger store managers. But, as

in *Flax*, where a similar effort was made, the "testimony was conclusory and lacked specific factual examples," *id.*

The case of a 40-year old manager in defendant's Knoxville store was cited. Though that store lost money every year from 1971 to 1977, this manager was not demoted. But the evidence revealed that he did not become manager until 1977 and that the store produced its first substantial profit in eight years in the following year.

Again, in evidence which claimant did not see fit to bring forward in brief or appendix on this appeal, two other older store managers testified, as claimant's witnesses, about encounters with Cardwell. One, 55 years old, suggested that Cardwell overcompensated for this manager's health problems and created morale problems by interviewing his employees privately. The other, 61 years old, testified that in August 1978, Cardwell told him that new pressures were being put on store managers, that some—including Lovelace—were considering or being considered for moves to sales jobs with less pressure, and that this manager might want also to consider such a move.

Against whatever inference these isolated episodes were designed to create, there was the undisputed fact that at the time of claimant's demotion nearly half of the managers in the Asheville district were over 50 years old and fully a quarter of those in the mid-south region were older than claimant. It is perhaps understandable on this basis why claimant did not press any significance for this testimony on appeal.

ment of probabilities. Inquiry must therefore proceed to the effect of the presumption.

■ The first question here, of course, is whether the presumption was invoked. Because the predicate of replacement is not in dispute, the only necessity was to show, under the adapted *McDonnell-Douglas* scheme, that at the time of his demotion claimant was "performing his job at a level that met his employer's legitimate expectations." *See Loeb*, 600 F.2d at 1014. On this, we have serious reservations. The burden of production as to this predicate is also of course upon the claimant. We think it important to hold employee-claimants in discharge, demotion, reassignment, and like cases to the burden of showing that performance at the requisite level of employer expectations continued to a time reasonably close to the time of the challenged employer action. The presumption is rationally supportable only to the extent this is done, since its effect is to create a mandatory inference—one justifying judgment—if not dispelled, *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094, that with performance established as satisfactory, there is no reasonable explanation for the challenged action but age discrimination. *Cf. International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866 n.44, 52 L.Ed.2d 396 (basis of inference in Title VII case). The rationality, hence fairness, of this inference obviously decreases as the time gap between last proven satisfactory performance and challenged employment action lengthens. Here, the time lag was almost two years. As common experience in such matters teaches, and as the full record reveals the case here to have been, a great deal can happen to alter things in such a time. We think it a very close question whether on this basis the presumption was effectively triggered. Solely for purposes of this appeal, we can assume that it was and proceed to the next stage of assessment: whether defendant carried its burden to dispel the mandatory presumption.

■ The question here is simply whether the defendant has "introduc[ed] . . . admissible evidence" of a "legitimate nondiscriminatory reason" that is "legally sufficient to justify a judgment for the defendant." *Burdine*, 450 U.S. at 254–55, 256–57, 101 S.Ct. at 1095–96. There is no doubt that this relatively modest burden was carried. The defendant offered evidence—internally consistent, corroborated by a number of witnesses perfectly positioned to have knowledge of the relevant facts, through testimony that was in minimal terms not manifestly incredible—that claimant was demoted in the exercise of a reasonable business judgment that he was no longer performing at the level of the employer's legitimate expectations. Though the district court indeed characterized this evidence as "overwhelming," it was only necessary to determine as a matter of law that it was legally admissible, that it was not intrinsically unworthy of acceptance, and that the reason as advanced was a legitimate one. *Cf. Loeb*, 600 F.2d at 1011–12, n.5.

At this point in the assessment the probative force of the presumption had been completely dispelled. The evidence that sufficed to invoke it, though still in the case, had now only its intrinsic, unaided force as support for the necessary inference. That necessary inference had now, however, been recast in a more narrow form, at a "new level of specificity," *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1095, through the defendant's commitment, forced by the presumption, to a specific reason. The ultimate motivational issue has now become whether, considering only age discrimination and the defendant's proffered reason as possible explanations, discrimination is the "more likely." *Id.* at 256, 101 S.Ct. at 1095. The plaintiff's new production burden has correspondingly become whether, as between only these two proffered reasons, the circumstantial evidence supports as a reasonable probability the inference that but for claimant's age he would not have been demoted.

■ We are satisfied that at this stage in the assessment the claimant's still wholly circumstantial evidence, unaided now by any presumptive force, no more sufficed to support the necessary inference as against the defendant's specifically advanced explanation than it sufficed to support it in the absence of any proffered alternative. The evidence for assessment at this stage is the same as that assessed preliminarily to determine whether it sufficed, independently of the presumption, to make a prima facie case. Where, as here, the employer's proffered reason for the challenged action is unacceptable performance, any evidence designed to show the proffered reason pretextual is of a piece with and inseparable from evidence offered to invoke the presumption by showing essential "qualification." *See Burdine*, 450 U.S. at 255, n.10, 101 S.Ct. at 1095, n.10; *Loeb*, 600 F.2d at 1014. Indeed, at this stage, though the range of possible reasons before the court has been reduced to only two, theoretically lessening claimant's burden to establish substantial probability of the necessary one, *see Wratchford v. S. J. Groves & Sons Co.*, 405 F.2d at 1066, the burden has in fact been made more difficult to the extent the facts underlying the employer's specifically advanced explanation (as opposed to the explanation itself) stand essentially unrefuted. *See Smith v. Flax*, 618 F.2d at 1066–67.

■ Here, that is the case. The essential facts underlying defendant's articulated reason—the critical record indicia of unchecked and steady decline in performance results for at least the final two years of claimant's tenure as store manager and his refusal, for whatever reason, during that critical period to admit or to take corrective action specifically suggested by his employer—were not essentially refuted despite the opportunity to do so by way of showing the reason based upon them to be pretextual. Claimant's evidence on this score consisted essentially of offering his own opinion that corrective action was not needed and of

pointing to other favorable performance indicia, while not refuting the validity of the unfavorable indicia nor their manifestly greater significance in evaluating his most recent performance; to testifying that his employer's fault-finding only commenced in the late stages of his tenure as store manager[16] rather than demonstrating that no fault existed; and to the expression of his own opinion that his performance continued to meet reasonable expectations.

Taken all together—whether offered directly to establish the "qualification" predicate of the original presumption or to show defendant's proffered explanation of his demotion to be pretextual—claimant's evidence did not suffice to allow a jury to infer that age discrimination was a determinative factor in this demotion. Though age discrimination is undoubtedly a possibility in any case of this kind, and though its easy concealment is a constant danger in attempts to vindicate this statutory right, a jury may nevertheless not be allowed to infer it from evidence that does no more than suggest it as a possibility.

In addition to the bare facts that after a long period of unquestionably satisfactory and better performance this claimant at age fifty-five was demoted and replaced by a man six years younger, there is only the most meager evidence that might raise the theoretical possibility to the level of such substantial probability that a jury could rationally infer it as a determinative cause. There is the fact that the claimant himself held and expressed the opinion that his performance remained satisfactory notwithstanding the unrefuted indicia from business records that it was not. This, we have held, simply cannot in fairness be ascribed any significant probative force where the self-serving opinion is not corroborated by more objective ones. *Smith v. Flax*, 618 F.2d at 1067. There is the further fact that the employer did in the latter stages of claimant's tenure begin increasingly to find specific fault with his performance, and to

---

**16.** The inferential force of this particular evidence must of course be measured against the undisputed fact that it was during this period that for the first time in claimant's tenure there was apparent cause for great concern with his performance.

suggest specific corrective measures. From this claimant argues that the jury could and should be allowed to (and possibly in this case did) infer a deliberate contrivance to set up claimant's demotion. Again, this is obviously a possibility, but the leap of inference required is simply too large to allow in logic and fairness. To accept it a jury would have to lay aside the unrefuted evidence that problems did exist and infer instead a deliberate scheme carried out carefully over a period of around two years, involving the extensive, venal efforts of several people and having as its final object only the demotion, not the outright discharge, of a single employee at the end of this extended plot. Such a leap of inference could only be by rank speculation and not by any rational processes of inference.

When, as is proper, the unrefuted basic facts underlying the employer's proffered explanation of the demotion are taken into account in assessing the reasonableness of the necessary inference, we are satisfied that the district court properly granted judgment n. o. v.

AFFIRMED.

ALBERT V. BRYAN, Senior Circuit Judge, concurs in the result.