878 F.2d 1430
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Patrick Wayne GILHAM, Plaintiff-Appellant,
and
United States Air Force, Plaintiff,
v.
USX CORPORATION, Defendant-Appellee,
and
Ashland Chemical Company, a Division of Ashland Oil, Inc., Defendant.
 No. 88-3211.
 United States Court of Appeals, Fourth Circuit.
 Argued June 7, 1989.
Decided July 6, 1989.
 
 John Patton Ford, Jr. (David W. Goldman, Bryan Law Firm on brief) for appellant.
 David A. Luptak, Sr. (Elizabeth L. Peters, USX Corporation on brief) for appellee.
 Before PHILLIPS and SPROUSE, Circuit Judges, JAMES H. MICHAEL, Jr., United States District Judge for the Western District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 In this diversity action, Patrick Wayne Gilham appeals the dismissal by summary judgment of his products liability suit against the USX Corporation. Because Gilham has failed to produce evidence sufficient to establish the existence of an element crucial to his case, we affirm.
 
 
 2
 * Gilham was employed as a welder for the United States Air Force at Shaw Air Force Base in South Carolina. On September 14, 1983, he was instructed to cut the top off a 55-gallon steel drum. Upon examination of the drum, Gilham concluded that it was new, and he therefore did not vent or purge it prior to beginning his work. To cut off the top he used an oxyacetylene cutting torch. The drum exploded some three seconds after Gilham first used his torch on the drum, and Gilham received severe injuries.
 
 
 3
 The drum was manufactured at the Masury, Ohio, plant of the Container Products Division of the United States Steel Corporation, now named USX Corporation (USX). USX manufactured the drum pursuant to a contract with the Department of Defense. Under this contract USX manufactured approximately 1356 of these drums, all of which were manufactured in a three to four hour process on December 29, 1982.
 
 
 4
 Among the contract requirements, USX had to spray on the interior surfaces of each drum a rust-preventive oil. The material used was Tectyl 900. USX received the Tectyl 900 used for this contract on December 8, 1982. The Tectyl 900 container remained sealed until the morning of December 29, at which time it was placed into a new pail, and the pail was in turn placed inside a spray pressure pot, which was then closed and sealed. Fog-spraying the Tectyl 900 into the manufactured drums was the last step of the drum assembly process. At this point in the procedure, the cap covering the two-inch opening in the top of the drum was removed and the Tectyl 900 was sprayed into the drum. After the fog-spraying, the cap was immediately replaced and was not again removed by USX. The manufacturing process was monitored by Stephen J. Delach, a quality assurance representative employed by the Defense Department.
 
 
 5
 After their manufacture by USX, the drums were shipped to the Defense General Supply Center in Bell Bluff, Virginia. Here the drums were stored in a controlled access area. The subject drum was shipped to Shaw AFB in June 1983, arriving June 21, and was delivered to the munitions branch on June 22. Sergeant Larry Patterson, an inspector, testified (all testimony recounted is deposition testimony) that upon receipt of the drum he removed the drum cap and, with the help of a flashlight, undertook a visual inspection of the inside of the drum to ensure that it was clean and new. He also testified that he detected no odor other than that of the preservative.
 
 
 6
 From the date of its delivery to the munition branch to the date of Gilham's injury, approximately three months, the drum remained stored in an area where Air Force personnel were painting missiles. Solvents were stored and used in that area. The drum was delivered to the welding shop at Shaw in September 1983, and Gilham was injured September 14. Gilham testified that he thought the drum was new and unopened because the caps were not banged up and the paint was still on them. He also testified that when he rolled the drum into the welding shop, he heard no sound that would indicate there was any substance inside the drum.
 
 
 7
 The Air Force conducted an investigation of the accident and examined two other drums manufactured by USX on December 29, 1982. The Air Force chemist's results showed that the chemical composition of the other drums was consistent with that of Tectyl 900. This chemist, J.D. Hillsberry, also testified that no substance in these drums possessed a flashpoint--the point at which explosion would occur--less than 141 degrees. Gilham's own expert, Dr. Richard Henderson, testified that the cutting torch could only have heated the drum to a temperature of 70-75 degrees, and that therefore the explosion could not have been caused by the Tectyl 900 but must have been caused by some other substance. Gilham's expert could not state whether this substance was in the drum either at the time of its manufacture or of its subsequent delivery by USX. He did concur that the two sister drums contained only a substance consistent with the composition of Tectyl 900.
 
 
 8
 Gilham argued before the district court that from the forecast of evidence it was inferable that the drum had been contaminated before it left USX's Ohio manufacturing plant. The district court disagreed and granted USX's motion for summary judgment, holding that Gilham had failed to provide evidence that could lead a jury reasonably to conclude that the substance causing the explosion was put into the drum while it was still in USX's possession. Gilham now appeals.
 
 II
 
 9
 In order for Gilham to prevail in a products liability action under South Carolina law, he must establish three elements:
 
 
 10
 (1) that he was injured by the product; (2) that the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant; and (3) that the injury occurred because the product was in a defective condition unreasonably dangerous to the user.
 
 
 11
 Madden v. Cox, 328 S.E.2d 108, 112 (S.C.App.1985). See also Claytor v. General Motors Corp., 286 S.E.2d 129 (S.C.1982); S.C.Code Sec. 15-73-10. Of these three elements, only the second is in dispute here.
 
 
 12
 To survive summary judgment, Gilham must present facts sufficient to establish the existence of each element of his case. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In cases dealing with the sufficiency of the evidence to avoid directed verdict or jnov, we have required " 'reasonable probability' as the proper test of sufficiency of circumstantial evidence...." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 242 (4th Cir.1982), quoting Wratchford v. S.J. Groves & Sons Co., 405 F.2d 1061, 1066 (4th Cir.1969). Speculation and mere possibility are not sufficient. Lovelace, 681 F.2d at 242. The Supreme Court has instructed that these standards of sufficiency apply as well at the summary judgment stage as at the directed verdict stage of a lawsuit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).
 
 
 13
 When Gilham initially brought this case, it was under the theory that the Tectyl 900, which no one disputes was sprayed into the drum, caused the explosion that injured him. After discovery, however, he had to drop this theory, because his own expert deposed that none of the ingredients composing Tectyl 900 would have reached flashpoint in the three seconds that Gilham applied heat to the drum.
 
 
 14
 Gilham now contends that a jury reasonably could have found on the evidence as forecast that the source of the explosive material was some solvent used to clean the fog spray gun. In support of this proposition he points to the evidence that the USX contracts only rarely required that drum interiors be sprayed with a fog spray gun. A USX supervisor at the Ohio plant testified that perhaps only one percent of the contracts had this requirement, and that between 1977 and 1985 the spray gun was used approximately only three times. On the basis of this evidence, Gilham contends that it was likely the holes in the spray tip, which were almost pin size, became clogged over the periods of disuse by the remnants of the oil spray and that a worker used a solvent to clean them. Gilham then hypothesizes that after the solvent was used, some of it remained in the spray gun and was then sprayed into the next drum, and this was the drum that caused Gilham's injuries. (It is apparently unchallenged that if this solvent was in the drum it could have exploded on Gilham's use of his torch.) Gilham also maintains that the government quality inspector could not be counted on to catch this mistake in the manufacturing process, particularly since the production line was a quarter-mile long.
 
 
 15
 In additional support of this theory, Gilham attempts to negate the possibility that the containment could have entered the drum at any other stage. After manufacture, the drum was sealed and transported to the Defense General Supply Center in Virginia, a secured facility with restricted access. When the drum arrived at Shaw AFB, inspector Patterson testified that he opened the drum cap to ensure the drum was new, but also testified that he had never inspected a new drum before and relied on a sense of smell that only a preservative-like substance was on the inside. Further, Gilham challenges Patterson's testimony to the extent that Gilham testified that the drum caps looked like they had not been opened because they were not banged up and still had paint on them and he heard nothing inside the drum when he rolled it to the welding shop to indicate any foreign substance was in the drum.
 
 
 16
 USX, in contrast, challenges as highly speculative Gilham's theory of the origin of the drum's contamination. While it is true that solvents were used by USX to clean paint spraying equipment and that the same operators who sprayed the drum had used the paint spraying equipment, so were familiar with the solvent, there is no evidence that any operator ever used solvent to clean the fog spray equipment. To the knowledge of USX's supervisor, Strawser, the fog spray equipment had never been cleaned, while the paint spraying equipment was routinely cleaned with solvent after each day of use. Strawser also testified that he never saw any solvent in the area near the drums at any time during the period of manufacture.
 
 
 17
 Further, inspector Patterson was familiar with the smell of the solvent Gilham claims was used in the drum--Patterson related that the solvent is so potent that the smell of it "will knock you down"--and testified that no such smell was present when he inspected the drum. Also, while Gilham claims the drum cap looked new, Patterson testified that he used a soft metal wrench to remove the cap for inspection, in order to prevent sparks.
 
 
 18
 USX also argues that it is more likely that a solvent was put in the drum during storage at Shaw, when it was located near workers painting missiles, who sometimes disposed of waste in available drums.
 
 
 19
 The district court found this last contention speculative, and we agree, particularly given the highly detailed requirements for disposal of waste and the fact that the drum was apparently a different color than those into which waste was supposed to be placed.
 
 
 20
 Nevertheless, we also agree with the district court on the critical point of this case: that Gilham has failed to meet his burden to establish that there is a genuine issue respecting the material fact that the defect originated while the drum was in the hands of USX. This fact could not be inferred from the evidence except by a process of bold speculation and conjecture; the evidence does not support it as a reasonable probability. There is no evidence that the fog spray guns at any point became clogged, requiring the use of a solvent, no evidence that a solvent was used to clean the fog spray gun, no evidence that some of the solvent was sprayed into any drum, and no evidence that any solvent allegedly sprayed was sprayed into the drum that injured Gilham. As the district court noted, Gilham's theory is creative, but in the end it must depend for acceptance on a tenuous web of conjecture, and this does not suffice to avoid summary judgment. Gilham has not produced evidence sufficient to allow a jury rationally to find a fact critical to his case, and therefore we affirm the district court's grant of summary judgment to USX.
 
 
 21
 AFFIRMED.