23 F.3d 400
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Carolyn M. GAUMER, Plaintiff-Appellant,
and
Carol Jeanne GAUMER, Executrix of the Estate of Alice U.
McDAniel, Plaintiff,
v.
THE FIRST NATIONAL BANK OF NORTH EAST, A National Bank
chartered under the authority of the United States of
America, Treasury Department, Office of the comptroller of
Currency, Charter No 7064, Defendant-Appellee,
and
Richard D. McDANIEL; J. David McDaniel; John E. Hughes, Defendants.
 No. 93-1126.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 7, 1994.
Decided: May 11, 1994.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. M. J. Garbis, District Judge. (CA-88-3434-MJG)
 John Anthony Scaldara, Wright, Constable & Skeen, Baltimore, Maryland, for Appellant.
 H. Norman Wilson, Jr., Wilson & Campbell, Elkton, Maryland, for Appellee.
 Donald James Walsh, Wright, Constable & Skeen, Baltimore, Maryland, for Appellant.
 D.Md.
 AFFIRMED.
 Before WIDENER and WILKINSON, Circuit Judges, and BRINKEMA, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Alice U. McDaniel, the mother of defendant Richard D. McDaniel and Carolyn Gaumer, filed the original complaint against Richard D. McDaniel and his son and son-in-law, J. David McDaniel and John E. Hughes, respectively, as well as the First National Bank of North East (the Bank) alleging violations of various federal banking laws and also seeking damages under state common law in connection with the Bank's refusal to re-register certain stocks jointly to Alice McDaniel and Carolyn Gaumer. Mrs. McDaniel died while this action was pending and her estate was substituted as the plaintiff. Carolyn Gaumer and Carol Jeanne Gaumer filed an amended complaint, Carol Jeanne Gaumer in her capacity as executrix of the estate of Alice McDaniel and Carolyn Gaumer as an individual, alleging that she had an interest in the stock.
 
 
 2
 The case was tried to a jury, which found, essentially, that Richard McDaniel had no legal right to the stock in question and that the Bank had conspired with Richard McDaniel to prevent Alice McDaniel from transferring her shares to Carolyn Gaumer. The jury also awarded punitive damages to Carolyn Gaumer against the Bank. The court then granted judgment notwithstanding the verdict, Fed.R.Civ.P. 50(b), for the Bank but entered the judgment for Carol Jeanne Gaumer as Executrix of the estate against Richard McDaniel. Plaintiff Carolyn Gaumer appealed from the Court's grant of judgment n.o.v. on her claim for punitive damages against the Bank. Because we agree with the district court's conclusion that the plaintiff did not produce sufficient evidence to support a verdict against the Bank, we affirm.
 
 I.
 
 3
 The evidence presented to the jury, in the light most favorable to appellant Carolyn Gaumer,* was essentially as follows. The Bank is a McDaniel family business. Family members control the Bank to this day. (JA 128, 156-157). The McDaniel family used joint tenancies with rights of survivorship as a testamentary substitute, that is, to transfer Bank stock at death without incurring inheritance tax. (JA 158, 161, 162).
 
 
 4
 In 1963, Alexander McDaniel, Alice McDaniel's husband, died. Alice McDaniel inherited ten shares of Bank stock from him and also became the sole owner of another forty-five shares which she and her husband had held as joint tenants. (JA 114-116). She already held another fifty-five shares, acquired sometime before 1963, which was registered to herself and Carolyn Gaumer. (JA 114-118).
 
 
 5
 On September 26, 1963, Alice McDaniel endorsed in blank the certificates for the forty-five shares and fifty-five shares and gave them to Richard McDaniel, who took them to the Bank. (JA 114-118, 150.) Without requiring Carolyn Gaumer's consent, the Bank issued a new certificate, # 180, for 100 shares in the names of Alice and/or Richard McDaniel as joint tenants with right of survivorship and not as tenants in common. (JA 116, 150). At the time of the 1963 transfer, Richard McDaniel was a major stockholder and president of the Bank. (JA 149). In September, 1963, Alice McDaniel endorsed the certificate for her ten inherited shares and gave that certificate to Richard McDaniel.
 
 
 6
 He took it to the Bank and had new certificate # 181 issued, again in the names Alice and Richard McDaniel as joint tenants with rights of survivorship. (JA 90, 114-117). Richard McDaniel gave the new certificates to his mother. (JA 162). Despite the transfers, Alice McDaniel continued to treat all 110 shares of stock as her own, retaining sole control, voting the shares and receiving the dividends. (JA 58). This is consistent with Alice McDaniel's understanding that registering the stocks in both her own name and Richard McDaniel's was only for the purpose of indicating that she wanted him to become the owner at her death. (JA 57-58, 63).
 
 
 7
 Initially, the Bank also treated the stock as if it were Alice McDaniel's sole property, notwithstanding the way it appeared on its ledger. In 1974 and 1980, the Bank, over the signature of Richard McDaniel as President, wrote to Alice McDaniel stating that she held the shares in question. (JA 81). Similarly, the Bank filled out a questionnaire for Alice McDaniel in 1987, (in the context of plans to exchange shares in the Bank for shares in a bank holding company), stating that she held 21,565 shares of stock (multiplied since 1963 by several splits and reinvestments of dividends). (JA 80, 118-120, 397, 482, 485). At trial, Gaumer offered this evidence to prove that the Bank knew that Richard had no claim to these shares.
 
 
 8
 Meanwhile, the Office of the Comptroller of the Currency (O.C.C.) had taken action against Richard McDaniel, resulting in his agreeing to remove himself from the Bank's operations, as of April 30, 1987, as part of a settlement. (JA 65). Richard McDaniel's shares in the Bank, a controlling interest just under fifty percent, went into a revocable trust, the Shady Beach Trust, paying him income, with his children as beneficiaries. (JA 110-111). Other McDaniel family members including Richard's son, J. David McDaniel, and his son-in-law, John E. Hughes, remained in control of the Bank. (JA 157).
 
 
 9
 At about this time, Alice McDaniel, still treating the stock as entirely her own, decided to place her daughter Carolyn Gaumer's name, rather than Richard McDaniel's, on the stock, in order to have it pass to Carolyn at Alice's death. (JA 68). She requested that the Bank change the stock certificates so as to name herself and Carolyn Gaumer as joint owners with rights of survivorship, rather than herself and Richard. (JA 67). This time the Bank refused to do so without signatures of both Alice and Richard McDaniel, as the joint owners. (JA 61, 88-89, 137-141, 424, 430). This was a change from the Bank's previous policy, which apparently was to treat jointly-owned stock as if it belonged solely to Alice McDaniel. (JA 89-90).
 
 
 10
 In December, 1987, the Bank, now aware of the dispute between Richard McDaniel and his mother, advised Alice McDaniel that it intended to deposit all dividends of the stock in question into an escrow account until the dispute was resolved. (JA 96). This took place eight months after Richard McDaniel had withdrawn from any involvement with the Bank. The Bank also began requiring that Richard McDaniel co-sign dividend checks. (JA 67). For the previous twenty-five years, the Bank had never required Richard McDaniel's signature on these checks in order for Alice McDaniel to cash them. (JA 60, 68, 135).
 
 
 11
 The jury also heard evidence that, during the same time period, McDaniel Enterprises, which Richard controlled, ceased paying for Alice McDaniel's auto insurance, did not renew her Conoco credit card and stopped paying for accountants to complete her tax returns. (JA 61-62, 106-108). Richard McDaniel also had an employee remove Alice McDaniel's license tag, "240", a prestigious low number, from her 67 Ford Galaxy, replacing it with a high-numbered plate from his wife's car. (JA 105). There was some evidence that Alice McDaniel's health insurance had been cancelled. (JA 62, 178-181). One witness, Alice McDaniel's accountant, also a Bank Director, speculated that Blue Cross had probably cancelled the policy because Alice McDaniel was not a Bank employee. (JA 178-181). Alice McDaniel complained bitterly about these events, and enlisted the help of her attorney, Stanley Lowicki. (JA 73ff).
 
 
 12
 Unable to convince the Bank to reissue the stock certificates to Alice and Carolyn without Richard's signature, Lowicki went to the Bank on January 27, 1988. (JA 89). Meanwhile, because of the dispute, a Bank auditor had been investigating the records pertaining to the shares in question and discovered that the "joint tenants" language that appears on the original certificates had been omitted from the stock ledger caption and some later certificates, and so notified Alice McDaniel. (JA 249-54, 440-43). The Bank then reworked the ledger, replacing an original "sheet 2" with a corrected "sheet 2." (JA 452, 453). Thus, when Lowicki went to the Bank to review the records, he found a new-looking "sheet 2" which referred to "joint tenants" and eventually an older-looking "sheet 1" which did not mention "joint tenants" but was headed "Alice U. McDaniel or Richard D. McDaniel WROS--and not as tenants in common." (JA 91-92, 437-39, 489-490). Lowicki questioned David McDaniel, then the Bank President, about these differences between "sheet 1" and "sheet 2", and was told that "sheet 2" was a corrected sheet and that the original, wrong "sheet 2" had been destroyed. (JA 95, 253, 450, 451). Later, during the discovery phase of this lawsuit, the Bank produced the original "sheet 2", which, like "sheet 1" did not use the term "joint tenants." Finally, the jury heard evidence concerning the valuation of the shares in question.
 
 
 13
 At the close of plaintiff's case, all defendants moved for judgment. The court granted motions for judgment in favor of J. David McDaniel and John E. Hughes. (JA 124). At the close of defendants' case, the court granted the remaining defendants' motions as to some counts. (JA 269). The court sent to the jury, using special verdicts, the conspiracy count and the question of the effect of the 1963 conveyances.
 
 
 14
 On the first special verdict, concerning the September and December 1963 transactions, the jury found that ownership of the original 110 bank shares was "transferred to go to Richard D. McDaniel on Alice U. McDaniel's death subject to revocation by Alice U. McDaniel at any time." (JA 294). On the second and fourth special verdicts, respectively, the jury found that Richard and the Bank had conspired in 1987 to prevent Alice McDaniel from transferring her stock to Gaumer and that the Bank was liable to Carolyn Gaumer for punitive damages of $240,000.00. (JA 295, 297).
 
 
 15
 The Court entered judgment for plaintiff Carol Jeanne Gaumer, as executrix of the estate, against Richard D. McDaniel, in the amount of $237,215.00, plus interest, and declared that the shares of stock in question be awarded to Richard as his sole property. (JA 340). The Bank then filed a motion for judgment n.o.v. as to the jury's award of punitive damages. The motion was granted. (Memorandum Opinion at JA 343-347).
 
 II.
 
 16
 The standard for granting judgment n.o.v. is the same as that for summary judgment: it is appropriate where there is no evidence upon which a jury can properly find a verdict. Whalen v. Roanoke County Bd. of Sup'r.s, 769 F.2d 221 (4th Cir.1985), citing Ralston Purina Co. v. Edmunds, 241 F.2d 164 (4th Cir.1987). We essentially review de novo the district court's decision, taking all evidence favoring the non-moving party as credible and asking whether a reasonable and impartial jury could reasonably return a verdict for the non-moving party. Crinkley v. Holiday Inns, 844 F.2d 156, 160 (4th Cir.1988); Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 243 n. 14 (4th Cir.1982); Tights, Inc. v. Acme-McCrary Corp., 541 F.2d 1047, 1055 (4th Cir.1976); Wyatt v. Interstate & Ocean Transp. Co., 623 F.2d 888, 891 (4th Cir.1980).
 
 
 17
 At issue here is whether appellant Carolyn Gaumer produced evidence that would convince a reasonable jury by a preponderance of the evidence that the Bank conspired with Richard McDaniel in 1987 to help him convert the stock by preventing Alice McDaniel's proposed transfer of the stock to Carolyn Gaumer. The appellant asks this court to impute Richard McDaniel's knowledge and intent to the Bank, based on her argument that Richard McDaniel effectively controlled the bank in 1987, even after the OCC removed him from the position of Bank president. There is no evidence in the record to show that he maintained such control. Moreover, appellant produced no evidence to establish that the Bank was on notice in 1987 that Richard McDaniel's claim to the stock was unjust. On the contrary, the evidence shows that the Bank was only following prudent policies and advice of counsel in requiring both registered owners to consent to Alice's proposed transfer of stock.
 
 
 18
 To be sure, evidence of a conspiracy is likely to be circumstantial. Here, however, the evidence of the Bank's actions is consistent with a Bank which has recently had difficulties with the bank regulators and is attempting to operate under proper banking procedures. The above-recited evidence shows that before 1987, the Bank treated McDaniel family stock rather informally, ignoring normal corporate formalities, and that after the OCC's action, the Bank attempted to proceed conservatively, seeking both registered stock owners' permis sion to transfer the shares. The Bank also acted prudently and fairly to both parties by putting the dividends in escrow pending resolution of the dispute and in consulting outside counsel. While Richard McDaniel may have temporarily benefitted from the Bank's improved policies, this does not prove bad intent on the Bank's part.
 
 
 19
 The evidence of the "altered" or "corrected" stock ledger is a red herring. The Bank's investigation of its records was an appropriate response to the dispute over the shares' ownership. As described above, the reason for the new page was to bring the Bank's ledger caption into conformity with the original certificates. In other words, the new sheet was meant to reflect, not hide, the way the shares were titled. We cannot infer a sinister motive from the Bank's attempt to correct old errors, especially when the Bank immediately notified Alice McDaniel of the correction it had made.
 
 
 20
 Similarly, the fact that Richard McDaniel took all kinds of adverse action toward his mother when she attempted to transfer the stock is not probative of misconduct by the Bank. There was no evidence that the Bank participated at all in these actions. As the trial court found, the Bank acted properly in refusing to take either party's side. In short, we conclude that the evidence at trial was not sufficient to convince a reasonable jury by a preponderance of the evidence that the Bank conspired with Richard McDaniel to block Alice McDaniel's transfer of stock to Carolyn Gaumer. The court's order granting judgment n.o.v. as to the Bank is therefore affirmed.
 
 AFFIRMED
 
 
 *
 See Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 243 n. 14 (4th Cir.1982)