CHARLESTON AREA MEDICAL CENTER, INCORPORATED, a West Virginia non-profit corporation; Cabell Huntington Hospital, Incorporated, a West Virginia non-profit corporation; City Hospital, Incorporated, a West Virginia non-profit, non-stock corporation; Fairmont General Hospital, Incorporated, a West Virginia non-profit, non-stock corporation; Herbert J. Thomas Memorial Hospital, a West Virginia non-profit, non-stock corporation; Monongalia County General Hospital Company, a West Virginia non-profit, non-stock corporation; St. Francis Hospital of Charleston, Incorporated, a West Virginia non-profit, non-stock corporation; St. Marys Hospital of Huntington, Incorporated, a West Virginia non-profit, non-stock corporation; Stonewall Jackson Memorial Hospital Company, Incorporated, a West Virginia non-profit, non-stock corporation; United Hospital Center, Incorporated, a West Virginia non-profit, non-stock corporation; Raleigh General Hospital, a West Virginia corporation; Teays Valley Health Services, Incorporated, a West Virginia corporation; Weirton Medical Center, Incorporated, a West Virginia non-profit, non-stock corporation, Plaintiffs–Appellees,

v.

BLUE CROSS AND BLUE SHIELD MUTUAL OF OHIO, INCORPORATED, Defendant–Appellant,

and

Blue Cross and Blue Shield Association, Defendant,

National Association of Insurance Commissioners; Ohio Department of Insurance, Amici Curiae (Two Cases).

Nos. 92–1746, 93–1053.

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1993.

Decided Oct. 4, 1993.

James Crawford Roberts, Mays & Valentine, Richmond, VA, argued (M. Scott Hart, Mays & Valentine, Paul S. Lefkowitz, John E. Schiller, Kimberly M. Orch, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., L.P.A., Cleveland, OH, on the brief), for defendant-appellant.

Donald B. Ayer, Jones, Day, Reavis & Pogue, Washington, DC, argued (Gregory M. Luce, Timothy E. Flanigan, Steven J. Mintz, Jones, Day, Reavis & Pogue, Washington, DC, on the brief), for plaintiffs-appellees.

Before HAMILTON, Circuit Judge, HEANEY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation, and SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation.

### OPINION

HEANEY, Senior Circuit Judge:

The Charleston Area Medical Center and twelve other West Virginia health care providers ("the Hospitals") sued Blue Cross and Blue Shield Mutual of Ohio, Inc., ("the Cleveland Plan") for recovery of over $7.4 million in unpaid bills owed by Blue Cross and Blue Shield of West Virginia, Inc. ("the Charleston Plan"). The plaintiffs alleged tortious interference with contract. On 17 April 1992 a

jury awarded the plaintiffs $7,418,928.38 in compensatory and $15,000,000 in punitive damages. Upon motion of the plaintiffs, the district court also awarded prejudgment interest.

On appeal, the Cleveland Plan asserts the district court abused its discretion or erred by denying its motions for abstention, for judgment as a matter of law, for a new trial, for relief from the judgment, and for alteration or amendment of the judgment. It also cites as error the district court's award of prejudgment interest, the imposition of punitive damages, and numerous evidentiary rulings. After a careful review of the record, we conclude that the evidence was insufficient to support the verdict as a matter of law.

## I

The Charleston Plan provided health insurance coverage to subscribers in West Virginia until October 1990 when the Insurance Commissioner of West Virginia began statutory liquidation proceedings against the company. The financial condition of the Charleston Plan had begun deteriorating in 1986 and continued to worsen until it became insolvent and impaired in late 1989. In April 1990, James Heaton, chief executive officer of the Charleston Plan, notified Hanley Clark, Commissioner of the West Virginia Department of Insurance, that the company was economically impaired as defined by the West Virginia Code. One month later Commissioner Clark concluded that the failure of the Charleston Plan was imminent.

Although Commissioner Clark, Heaton, and the Blue Cross and Blue Shield Association ("the Association")[1] considered alternative solutions to liquidation, Commissioner Clark ultimately instituted the liquidation believing that the interests of subscribers, creditors, employees, and the public would be endangered by further delay. Indeed, when Commissioner Clark filed the application for an order of liquidation in October 1990, the Charleston Plan was no longer able to meet its employee payroll, let alone pay for its debts or for the continuing health care needs of its subscribers. In addition, the Association had terminated the Charleston Plan's membership in and licensure by the Association, thereby also terminating the right of the Charleston Plan to use the Blue Cross and Blue Shield service marks. At the time of the liquidation, the Charleston Plan owed approximately $7.4 million to the Hospitals.

The parties do not dispute that the Charleston Plan was unable to pay its debts. The case turns rather on the alleged prospect of a merger or affiliation of the Charleston Plan with another Blue Cross and Blue Shield entity capable of providing it with sufficient resources to allow its continued operation. The search for an appropriate merger candidate had begun as early as 1988 when the Charleston Plan began negotiating a possible affiliation with the Washington, D.C., Blue Cross and Blue Shield company. Commissioner Clark rejected that possibility in February 1990 because, among other reasons, the Washington Plan would not commit to providing continued subscriber coverage in West Virginia.

Both Heaton and Commissioner Clark contacted the Association to request that it assist in the search for qualified merger or affiliation candidates. Senior Vice President Preston Jordan conducted that search on behalf of the Association, but few candidates were identified. Jordan initially considered Blue Cross and Blue Shield companies in Western Pennsylvania, Virginia, Illinois, Indiana, Cincinnati, and North Carolina, but the only company to express any interest in a potential arrangement with the Charleston Plan was Blue Cross and Blue Shield of Western Pennsylvania, Inc. ("the Pittsburgh Plan").

It was Heaton who contacted John Burry Jr., chief executive officer of the Cleveland Plan, in late May 1990. The two first met in early June and eventually, on 27 June, signed a letter of intent expressing their desire to affiliate. The letter of intent proposed that the Cleveland Plan would provide managerial

---

**1.** The Association is the Blue Cross and Blue Shield national licensing organization. All Blue Cross and Blue Shield affiliates must be members of the Association and comply with its requirements to use the Blue Cross and Blue Shield national service marks.

assistance for a fee, that it would purchase and lease back the Charleston Plan's headquarters building, and that the Cleveland Plan would provide a line of credit to be repaid out of surplus funds of the Charleston Plan. A final agreement was made contingent on the approval of each company's board of directors, the insurance commissioners of Ohio and West Virginia, and the Association. The letter of intent further provided that the Cleveland Plan would undertake an immediate due diligence examination of the Charleston Plan. Finally, the letter of intent included an exclusive negotiating clause—especially salient in this litigation—that prevented the Charleston Plan from seeking another affiliation while the letter of intent remained in effect.[2] The letter of intent had a closing date of 12 July 1990 that could be extended by either party—and was so extended at least five times. Notwithstanding the extensions of the letter of intent and its exclusive negotiating provision, the envisioned affiliation was never realized.

During the course of the Cleveland Plan's due diligence investigation, it either concluded that the proposed affiliation was imprudent because of the severe financial problems of the Charleston Plan or it decided to follow a different course of action notwithstanding the merits of the originally proposed affiliation. Whichever theory one accepts, the Cleveland Plan then embarked on a new and certainly original approach that consisted of several basic elements: a controlling affiliation with Blue Cross and Blue Shield of West Central West Virginia, Inc. ("the Parkersburg Plan"—a competitor of the Charleston Plan), state liquidation of the Charleston Plan, acquisition of the liquidated assets of the Charleston Plan, and the consolidation of those assets with the Parkersburg Plan to create a new Blue Cross and Blue Shield entity in West Virginia that would provide continuing health care coverage for all the

Parkersburg and Charleston Plan subscribers and jobs for their employees.

The Cleveland Plan then earnestly pursued an affiliation with the Parkersburg Plan and aggressively marketed the new approach to Commissioner Clark and other West Virginia state officials. Both efforts were successful. The affiliation gave the Cleveland Plan complete control of the Parkersburg Plan Board of Directors in exchange for an investment of $7 million in working capital cash and various forms of managerial assistance. The affiliation also anticipated the liquidation of the Charleston Plan and called for the Cleveland Plan either to provide an additional $7 million for the purchase of Charleston Plan assets or to acquire those same assets directly and transfer them to the Parkersburg Plan. The State of West Virginia then put the Charleston Plan into liquidation, allowing its assets to be purchased by the Parkersburg Plan free of encumbrances. The State, in turn, received assurances that the subscribers of the Charleston Plan would receive continuing health care coverage and that the employment of the Charleston Plan employees would continue uninterrupted.

After the Charleston Plan liquidation, the Parkersburg Plan became Mountain State Blue Cross and Blue Shield, Inc. It took over the payment to health care providers for services rendered to former Charleston Plan subscribers after 11 October 1990. The Hospitals and other creditors to which the Charleston Plan owed money for services provided before 12 October 1990 were left only with claims against the liquidated estate of the Charleston Plan. In the present action, the Hospitals allege that the Cleveland Plan intentionally forced the Charleston Plan into liquidation, thereby knowingly causing it not to pay its debts to the Hospitals. The Cleveland Plan counters that the liquidation was inevitable under any circumstances and was not caused by its actions. Because it cannot have been the cause of the liquidation,

**2.** The exclusive negotiating clause or "lockout provision" provided that

BC–W.Va. [the Charleston Plan] will not entertain negotiations with any other party or parties for the sale or assignment of any material BC–W.Va.'s assets or for the sale to or affiliation with any other party or parties for any

portion of BC–W.Va.'s business following your execution hereof until the earlier of July 12, 1990 or such other date as mutually agreed to by the parties in writing. During such period the parties shall use their best good faith efforts to consummate the transactions contemplated herein.

it argues, no reasonable jury could hold it liable for the Hospitals' losses.

## II

The legal theory on which the Hospitals sought recovery before the jury was tortious interference with contract. The district court instructed the jury that the Hospitals had to prove each of five elements of that tort by a preponderance of the evidence: (1) that the Hospitals were parties to valid contracts with the Charleston Plan at the time of the disputed acts of the Cleveland Plan; (2) that the Cleveland Plan knew or should have known of the existence of those contracts; (3) that the acts or the inaction of the Cleveland Plan proximately caused the Charleston Plan not to pay the Hospitals under the terms of those contracts; (4) that the Cleveland Plan intentionally caused that nonperformance;[3] and (5) that as a proximate result of the Cleveland Plan's conduct the Hospitals suffered damages. III App. at 1154. Neither party objected to the instruction. The only two of these elements truly at issue were causation and intent.

For the purposes of this decision we will assume that the Cleveland Plan did intend that the Charleston Plan be liquidated and that the Hospitals sustain the consequent damages. Establishing intent, however, will not carry the day for the Hospitals because they also had to prove that the Cleveland Plan proximately *caused* the liquidation and the consequent damages.

■ In its motions for summary judgment and judgment as a matter of law, the Cleveland Plan's arguments included the contention that its conduct could not as a matter of law constitute a proximate cause of the Charleston Plan's financial demise and subsequent failure to pay its debts to the Hospitals. Although issues of causation are to be decided by the jury, whether the evidence is sufficient to create a jury issue is solely a question of law to be determined by the court. *Miller v. Premier Corp.*, 608 F.2d 973, 981 n. 8 (4th Cir.1979). In diversity cases in which the sufficiency of the evidence

to create a jury question is presented, this court resolves the issue based on the federal rule. *Wratchford v. S.J. Groves & Sons Co.*, 405 F.2d 1061, 1065-66 (4th Cir.1969). That rule presents the question whether there is evidence on which a jury properly can base a verdict. *Lust v. Clark Equipment Co.*, 792 F.2d 436, 437 (4th Cir.1986) (citing *Ralston Purina Co. v. Edmunds*, 241 F.2d 164, 167 (4th Cir.), *cert. denied*, 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957)).

■ The question often has proved troublesome for the courts because judges are understandably loath to deny to earnest litigants their right to trial by jury. Fair and proper adjudication of disputes, however, precludes jury consideration of a party's claim unless the party produces evidence demonstrating that claim to be at least a reasonable probability rather than merely one of several equally surmisable possibilities. The fine analysis by Judge James Dickson Phillips in his decision in *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230 (4th Cir.1982), is instructive, especially in the instant case in which causation is so hotly contested:

> This emphasis, where causation is dispositive, upon "probability," "reasonable probability," "substantial probability" rather than mere "possibility" as the proper test simply bespeaks the special danger that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere "possibilities," by impermissible but understandable resort to such factors as sympathy and the like. It is of course precisely to guard against this danger that the burden of producing rationally probative evidence—and the corresponding risk of nonproduction—is placed upon claimants and subjected to the ultimate jury control device[ ] of [judgment as a matter of law].

*Id.* at 242.

■ Notwithstanding this danger of jury speculation, we are constrained when review-

---

**3.** The court initially erred in requiring only that the acts of the Cleveland Plan be intentional (it is the resulting nonperformance of contract that must be intended, not merely the acts that caused it), but corrected the error in the subsequent instruction on intent.

ing a case in which the sufficiency of the evidence is at issue to view the evidence in the light most favorable to the party against whom the motion is made, giving that party the benefit of all reasonable inferences from the evidence. We may not weigh the evidence, pass on the credibility of the witnesses, or substitute our judgment of the facts for that of the jury. *Lust,* 792 F.2d at 438; 9 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2524 (1971). That deference to the jury's findings is not, however, absolute: "A mere scintilla of evidence is insufficient to sustain the verdict, and the inferences a jury draws to establish causation must be reasonably probable." *Lust,* 792 F.2d at 437.

### III

■ To prove proximate causation in this case, the Hospitals had to show by a preponderance of the evidence that, were it not for the acts of the Cleveland Plan, the Hospitals would have been paid.[4] There is no dispute that the Charleston Plan reached insolvency and was unable to meet its obligations *before* the intervention of the Cleveland Plan. The Hospitals' theory is that the Cleveland Plan interfered with payment of the debt through conduct intended to prevent the rescue and rehabilitation of the Charleston Plan by a hypothetical affiliation with a third, unidentified company that, in turn, would have enabled the Charleston Plan to pay its debt.

■ The principal acts of the Cleveland Plan alleged to have prevented the desired affiliation were the repeated extensions of the letter of intent after the Cleveland Plan

already had conducted its due diligence and abandoned its original proposal. Those extensions maintained in force the exclusive negotiating clause between the Cleveland and Charleston Plans. There was some testimony that the exclusive negotiating clause discouraged other Blue Cross and Blue Shield entities from entertaining serious negotiations regarding a merger with the Charleston Plan. *See, e.g.,* II App. at 470, 495 (testimony of Commissioner Clark). Viewing that evidence in the light most favorable to the Hospitals permits the inference that the acts of the Cleveland Plan may indeed have frustrated a merger or affiliation with a suitable and interested candidate. The evidence remains insufficient to establish causation, however, because there is no evidence that any other entity was willing and able to entertain the kind of affiliation that would have enabled the Charleston Plan to pay its bills to the Hospitals. It was the Hospitals' burden to show by a preponderance of the evidence that, but for the acts of the Cleveland Plan, such an affiliation would have come to fruition. On that point the Hospitals offered only speculation and conjecture.

The record reveals that in 1990, apart from the Cleveland Plan, only one Blue Cross and Blue Shield entity arose as a possible affiliation candidate: the Pittsburgh Plan. The Pittsburgh Plan had an economic interest in the health of the Charleston Plan because the Charleston Plan managed significant local coverage for West Virginia subscribers who were part of Pittsburgh Plan national contracts. Commissioner Clark initially was

---

4. At oral argument, referring to the $7.4 million owed by the Charleston Plan, counsel for the Hospitals conceded the same: "We had to prove by a preponderance of the evidence that the particular obligations here would have been paid." Counsel later seemed to suggest, however, that the Hospitals would successfully have carried that burden by showing only that the Charleston Plan could have survived long enough (two or three months was implied) to pay that debt before liquidation. The Hospitals make a similar suggestion in their brief. Brief of Appellees at 18. The underlying assumption of this theory is that the unpaid debt accrued at the time of the liquidation is separable, for the purposes of this litigation, from whatever debt the Charleston Plan might subsequently have incurred for

services rendered to its subscribers during any extended period of its survival. This theory finds no support in the record. The record clearly demonstrates that Commissioner Clark would in no circumstances have approved an affiliation with a third entity that would have assisted only in the payment of past debt and not have provided for the continuing health care needs of the insured subscribers. Likewise, the evidence does not support the possibility of the Charleston Plan surviving on its own long enough to pay its debts. Were the Charleston Plan to have survived even a few months longer, the only reasonable inference to be drawn based on this record is that it would have accumulated even greater debt to the Hospitals.

quite interested in the Pittsburgh Plan because of its geographic proximity, its relatively good financial health, its economic interest in West Virginia, and its prior experience in assisting the Blue Cross and Blue Shield Plan of Utah. He later changed his mind after becoming better acquainted with the Cleveland Plan and the proposals offered by both it and the Pittsburgh Plan.

Eugene Barone, chief executive officer of the Pittsburgh Plan, said his company was willing to consider a loan of working capital secured by the Charleston Plan's headquarters building and other assets and was willing to provide managerial assistance. He also testified that the Pittsburgh Plan had no interest either in a full merger with the Charleston Plan or in supplying it with any unsecured credit. In addition, any provision of managerial assistance or secured credit would be contingent on approval of its own due diligence examination and the authority to exercise control over the operations of the Charleston Plan. *Id.* at 786–88. Commissioner Clark, however, already had determined that a short-term loan secured by the assets of the Charleston Plan would not be a workable long-term solution. *Id.* at 562–63.

It is undisputed that the Charleston Plan could not have affiliated with another Blue Cross and Blue Shield entity without the approval of Commissioner Clark. Commissioner Clark, moreover, made clear that his primary motivation and principal concern in finding a long-term solution for the ailing Charleston Plan was the continued health care coverage of West Virginia subscribers of the plan and the continued employment of the plan's employees. *Id.* at 481–82, 544–45. He initially sought to save the Charleston Plan and its coverage without resorting to liquidation, but in his words, "it became necessary to liquidate because rehabilitation was not a viable option." *Id.* at 244. He testified that at the time he applied for the liquidation of the Charleston Plan in October 1990 he did not believe he had any alternative. *Id.* at 260.

The alternative to liquidation, in the form of an affiliation, had been sought as early as 1988, and in the summer of 1990 the search for a suitable candidate was eagerly conduct-ed not only by Heaton of the Charleston Plan but also by Preston of the Association and Commissioner Clark of West Virginia. Everyone involved had a significant interest in finding an affiliation partner, but as Commissioner Clark reiterated in his application for the Charleston Plan's liquidation,

it became apparent that there were few candidates who had adequate financial resources to undertake a workable plan, which would require the commitment of the substantial sums of money necessary to address the financial problems of [the Charleston Plan], and who was interested in taking on the substantial risk of assuming a book of insurance business which has over the past four years produced a negative balance estimated at $37,000,000.00.

V App. at 1863.

In short, during the entire period from 1988 to October 1990 no one had identified a suitable affiliation partner. The Cleveland Plan had conducted the most serious negotiations, but chose, after a due diligence investigation, not to pursue an affiliation designed to save the Charleston Plan as a going concern. No other Blue Cross and Blue Shield entity proposed the kind of affiliation initially sought by Commissioner Clark, and the Cleveland Plan's final proposal was the best offer he received.

That the Pittsburgh Plan was willing late in the game to negotiate on terms not acceptable to Commissioner Clark may permit the inference of potential future negotiations on different terms. It may even permit the inference that an affiliation with the Pittsburgh Plan was a "possibility." It does not permit the inference that, but for the conduct of the Cleveland Plan, an affiliation with the Pittsburgh Plan that would have enabled the Charleston Plan to pay its debts to the Hospitals was reasonably probable—especially in light of the Charleston Plan's severe financial difficulties. The expressed interest of the Pittsburgh Plan, however, was the only evidence presented of *any* possible affiliation. With so few potential candidates, so little expression of interest, so severe the financial woes of the Charleston Plan, and so little time to recruit the assistance necessary to effect a successful rescue, we conclude that a hasty retreat of the Cleveland Plan after its

initial evaluation could not have assured for the Hospitals the reasonably probable payment of their accounts due.

After a review of the record, therefore, we are satisfied that the evidence does not suffice to support the verdict rendered below and that the defendant was entitled to judgment as a matter of law. Because we dispose of this appeal by concluding that the Hospitals have failed to show causation, we do not reach the other alleged errors.[5] Accordingly, based on the foregoing, we remand this case to the district court with instructions to enter judgment in favor of the defendant.

*REVERSED AND REMANDED.*

---

**5.** We are troubled by the district court's alleged abuse of discretion in denying the defendant's motion to abstain. Because we decide the case on other grounds we need not here resolve the issue. We nonetheless note for the record, first, that this litigation is based solely on a state cause of action and that jurisdiction derives from diversity of citizenship. Second, the Hospitals argued that liquidation of the Charleston Plan could and should have been avoided. This argument implicitly attacks the integrity of the insolvency proceeding itself and the corresponding decisions of Commissioner Clark and other state officials. Third, the case by necessity entails an analysis of the regulation of the insurance industry in West Virginia—a complex state statutory scheme involving policy problems of substantial public import and state interest. We believe this case presents precisely the type of litigation in which federal courts should carefully consider abstaining. *See Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Hartford Casualty Ins. Co. v. Borg–Warner Corp.*, 913 F.2d 419 (7th Cir.1990); *Grimes v. Crown Life Ins. Co.*, 857 F.2d 699 (10th Cir.1988), *cert. denied*, 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 934 (1989).