**Lev YUDOVICH, Irene Yudovich,
Plaintiffs,**

v.

**Michael P.W. STONE, Secretary
of the Army, Defendant.**

Civ. A. No. 92–1716–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 27, 1993.

June Kalijarvi, and George Chuzi, Washington, DC, for plaintiffs.

Theresa M. Buchanan, Asst. U.S. Atty., Alexandria, VA, for defendant.

## MEMORANDUM OPINION

CACHERIS, Chief Judge.

Plaintiffs Irene Yudovich and Lev Yudovich have brought this action for relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 633a. Plaintiffs allege discrimination in connection with their employment with the United States Army dur-

ing a time when they were working at the United States Army Russian Institute (USARI), in Garmisch, Germany. Plaintiffs also allege that they were terminated as a result of their complaints regarding the discriminatory environment; and that they were retaliated against in violation of Title VII when they applied for certain positions.[1]

The Defendant, United States Army, denies any discrimination and alleges that the Plaintiffs were disappointed bidders and are therefore not entitled to the relief they request.

For the reasons set forth below, the Court finds in favor of the plaintiffs with respect to their claims of discrimination based on religion and national origin and on their claim of retaliation. The Court finds in favor of the defendant on the claim of age discrimination. The motion to dismiss the plaintiffs' contract claim is denied.

## I.

### FINDINGS OF FACT

Plaintiffs Irene Yudovich and Lev Yudovich are Soviet emigres of the Jewish faith who left the Soviet Union in 1976/1977 and travelled to Israel. (Testimony, Irene Yudovich, Tr. Vol. I, pp. 212–214) Irene Yudovich was born on August 28, 1928, in the Ukraine. She graduated from the Moscow State Pedagogical Institute for Foreign Languages in 1950, with majors in English and Teaching of Foreign Languages. She served as an interpreter, employing modern methods of translation; she also taught modern methods of teaching, and fundamentals of translation. (Plaintiffs' Exhibit M) Plaintiff Lev Yudovich was born on April 10, 1925, in the Ukraine. He graduated from Moscow Foreign Institute and is certified as a German translator. He received a law degree from Moscow University. (Defendant's Exhibits 113, 114)

Defendant Michael P.W. Stone is being sued in his official capacity as Secretary of the Army.

In 1976 Irene Yudovich immigrated to Israel, leaving her husband, Lev, in Russia. Lev was unable to accompany her at that time because of his work as a lawyer in ongoing political trials; however eight or nine months later, he joined his wife in Israel.

Subsequent to his leaving Russia, Mr. and Mrs. Yudovich were invited by a human rights group to serve as legal advisors at a hearing in Rome. At that hearing, Lev Yudovich was asked to give a lecture at USARI, in Garmisch, Germany.

USARI is an element of the United States Army Intelligence and Security Command (INSCOM). USARI employs: (1) non-military personnel with GS ratings; (Testimony, Wai, Tr. Vol. II, p. 141); (2) GS "not-to-exceed" personnel in positions with a time limit of four years; (Testimony, Wai, Tr. Vol. II, p. 144); (3) Local Nationals (LN) who are subject to benefits given to them by the German government; (Testimony, Wai, Tr. Vol. II, p. 148); and (4) contractors who were expressly employed for a given period of time to a particular job. (Testimony, Wai, Tr. Vol. II, p. 148)

USARI's primary mission is to provide training for foreign area officers designated for specialty assignments related to the Soviet Union or Eastern Europe and to have its graduates serve as attaches, intelligence officers and instructors. (Plaintiffs' Exhibit B) USARI also educates its students in political, economic, and military history of the Soviet Union and Eastern Europe. USARI is staffed with a Commandant, as well as support and teaching personnel. (Testimony, Kosevich, Tr. Vol. III, p. 228)

The program of study conducted at USARI was a two-year program which contained a Language Training section and a Military and Area Studies section. (Testimony, Paul, Tr. Vol. I, pp. 17–18) On February 13, 1978, Irene Yudovich was hired by USARI (Language Training) as an LN professor of Russian Languages. (Testimony, Irene Yudovich, Tr. Vol. I, p. 215) After being recruited to lecture at USARI in 1978, Lev Yudovich accepted full-time employment

---

1. This Court denied plaintiffs' request for a jury trial ruling that the 1991 act was not retroactive.

See Rowson v. Arlington County, 786 F.Supp. 555 (E.D.Va.1992)

with USARI as an LN professor of Political Science. (Military and Area Studies) (Testimony, Lev Yudovich, Tr. Vol. II, p. 31)

From October of 1986 until June of 1991, Colonel Kosevich was the Commandant of USARI. (Defendant's Exhibit 44)

Although both plaintiffs were LN employees at USARI from 1978 until January 28, 1989, they wanted to become American citizens in order to convert to GS positions. Colonel Stoval assisted plaintiffs in their efforts to become citizens by addressing the Immigration and Naturalization Service Commission of Congress on their behalf. On February 6, 1987, plaintiffs came to the United States to further their efforts; however, they were told by Colonel Thornock not to worry about converting to GS positions. (Testimony, Irene Yudovich, Tr. Vol. I, p. 223) In order to obtain citizenship, Lev Yudovich went on leave without pay from his LN position so that he could stay in the United States from February 1987 until February 1988. During that period of time, Lev Yudovich became a GS employee of the United States at Fort Bragg, North Carolina. (Testimony, Irene Yudovich, Tr. Vol. I, pp. 224–226)

Colonel Kosevich extended their stay at USARI in order for them to satisfy the one-year residency requirement to attain United States citizenship. (Testimony, Irene Yudovich, Tr. Vol. I, p. 225; Lev Yudovich, Vol. II, p. 34; Kosevich, Vol. III, pp. 240, 247) In February of 1988, plaintiffs returned to USARI. They were sworn in as United States citizens on April 8, 1988. (Testimony, Irene Yudovich, Tr. Vol. I, p. 234)

In June of 1988, Major John D. Carlson became Chief of the Russian Language Division at USARI. As such, he was the immediate supervisor of plaintiff, Irene Yudovich. (Plaintiffs' Exhibit B).

On January 29, 1989, plaintiffs resigned their LN positions and accepted their appointments to GS positions. When Irene Yudovich switched from being an LN employee to a GS employee, Major Carlson told colleagues: "Now I've got her." (Plaintiffs' Exhibit A, pp. 3, 5) Thereafter on January 31, 1989, Carlson called her and cautioned her that she could be removed as a probationary employee. (Plaintiffs' Exhibit A, p. 5; Testimony, Irene Yudovich, Vol. I, p. 240)

On July 3, 1989, Carlson, armed with pliers, confronted Irene Yudovich alone in her office and berated her. When she tried to leave the office, Carlson physically prevented the door from being opened. Irene Yudovich became hysterical and screamed for help. She escaped and ran into a ladies room, with Carlson in pursuit. (Plaintiffs' Exhibit B) Carlson admits the episode occurred but insists he was only trying to calm Yudovich. (Plaintiffs' Exhibit A, p. 9)

On July 5, 1989, a number of the faculty, both Jewish and non-Jewish, including Irene Yudovich, wrote Colonel Kosevich a "Collective Request for Action". They complained about Carlson's creating at the Institute " . . . an atmosphere of psychological and physical pressure and stress resulting from micromanagement. This was achieved by refined techniques of groundless reprimands, fault finding, unjustified accusations of insubordination, excessive workloads affecting subordinates' health." They also complained that his style of management was " . . . aggressive, based on disrespect, humiliation of [their] professional and personal dignity, mental abuse and harassment of employees." (Plaintiffs' Exhibit AK)

Kosevich's response to their request was to address the faculty on August 8, 1989, during which he used a Russian phrase accusing them of being engaged in "subversive activities" (Plaintiffs' Exhibit B, p. 7) and advised them that "peaceful coexistence was over." The phrase "subversive activities" meant espionage or undermining activities; to a Russian emigre, this was a serious allegation. (Testimony, Irene Yudovich, Tr. Vol. I, pp. 257–258; Lev Yudovich, Tr. Vol. II, p. 51; Kosevich, Tr. Vol. IV, p. 8; Hassman, Tr. Vol. I, p. 157; Plaintiffs' Exhibit B, p. 7)

Shortly thereafter, Carlson attempted to summarily discharge Irene Yudovich during her probationary period based on allegations of unacceptable performance. (Plaintiffs' Exhibit A, p. 3)

In November of 1989, Irene Yudovich complained about her treatment by Carlson. Mi-

chael Harris, EEO counsellor, made a report concerning the tense atmosphere at USARI. (Plaintiffs' Exhibit Y) On November 9, 1989, Carlson informed Irene Yudovich that she was being separated from her probationary employment, effective December 1, 1989. As reasons of separation he cited lack of cooperation, insubordination, discourtesy, failure to meet suspense requirements, and defiance of supervisor's authority. (Testimony, Irene Yudovich, Tr. Vol. I, p. 265; Plaintiffs' Exhibit X) Kosevich and Lieutenant Colonel Mahlum, the Deputy Director of Training, approved the termination; however, Kosevich later withdrew it. (Plaintiffs' Exhibit AU)

When Lev Yudovich learned of his wife's termination, he became physically ill and beat his head with his hands. At Carlson's farewell party in November of 1989, Kosevich mocked Lev Yudovich's anguish by pretending to beat his own head. (Testimony, Thomas, Tr. Vol. I, p. 82)

On October 31, 1990, the results of the investigation of Irene Yudovich's discrimination complaint was filed by Investigator James Biggs. He found that Irene Yudovich had established a prima facie case of harassment, based on religion and national origin, but that she failed to establish a prima facie case of harassment based on age, sex, or protected activity. He further found that USARI failed to articulate a non-discriminatory reason for its actions towards Irene Yudovich. (Plaintiffs' Exhibit A, pp. 8, 9)

On November 28, 1990, Kosevich received the results of the investigation and USARI issued memos to the plaintiffs, notifying them that their NTE (not to exceed) two year appointments would expire in January, 1991. (Plaintiffs' Exhibit Z; Plaintiffs' Exhibit AA, ¶ 3) While employed at USARI, plaintiffs received good performance evaluations (Plaintiffs' Exhibit E); however, performance evaluations began deteriorating when it was time to terminate plaintiffs.

In December 1990 Irene Yudovich became ill as a result of a lung embolism and depression. As a result of the illness she collapsed. Thomas, Chief of the Soviet Studies Department, told Kosevich about her mental state and advised him that she had the potential for a nervous breakdown. (Testimony, Irene Yudovich, Tr. Vol. I, p. 272)

In January of 1991, USARI took the position that plaintiffs' term appointments had expired. When plaintiffs originally accepted appointment, they met with Carlson, Gross, Gorshenin and Major Huddleston. Plaintiffs were told that jobs were out for bid and no promises would be made. No mention was made at that meeting that the appointment was for two years. (Testimony, Thomas, Tr. Vol. I, p. 68; Lev Yudovich, Tr. Vol. II, p. 36) Furthermore, plaintiffs had specified in their applications that they would not accept temporary appointments. (Plaintiffs' Exhibits L, M; Testimony, Lev Yudovich, Tr. Vol. II, p. 41) Plaintiffs were issued their identification documents, which reflected at least three-year appointments. (Plaintiffs' Exhibit T)

In July of 1992, Colonel Prokopowicz changed command and Colonel Crutcher became Commander of USARI. (Testimony, Crutcher, Tr. Vol. IV, p. 93) Crutcher wanted to have recent emigres from Eastern Europe and the former Soviet Union as part of the USARI faculty.

In the summer of 1992, USARI solicited bids with the Assistant of the Regional Contracting Office for four teaching contracts. Plaintiff Lev Yudovich bid on four contracts: Political/Military, Instruction, Central Asia; Political/Economic Instruction; Political/Military instruction, Central Eastern Europe; Russian Language and Interpreting. (Testimony, Lesieur, Tr. Vol. III, pp. 14–16; Wai, Tr. Vol. II, pp. 153–154, 157–158) Irene Yudovich bid on one contract, Russian language and interpreting. (Testimony, Wells, Tr. Vol. III, p. 4; Defendant's Exhibits 93, 113)

A requirement of the contract job was that the bidder have had recent life experience in the Soviet Union. "Recent" was defined as within the last five to seven years. Irene Yudovich had not lived in the Soviet Union for the past five to seven years; however, Lev Yudovich had visited the Soviet Union in 1991 and 1992 for vacation. While there, he spoke to various Russian leaders. (Testimony, Lev Yudovich, Tr. Vol. II, pp. 66–68; Defendant's Exhibit 106, p. 67; Defendant's

Exhibit 107, p. 156). However, when Lev Yudovich applied for the position of instructor of Political Military Studies, his experience of vacationing and talking to political leaders in the old Soviet Union in August of 1991 and 1992 was not given any points on his rating.

The Army was aware that plaintiffs would be filing the discrimination suit and tried to take extra precaution with the contracting positions. In the weighing and comparing the plaintiffs as against the people who were actually selected, Novakov was given credit and was given points for recent life experience in the Soviet Union. However, because he had been out of the Soviet Union for 7 years, he should not have been given any points. (Defendant's Exhibit 118) Similarly, Reznickov was given points that he should not have been given. (Defendant's Exhibit 119; Testimony, Lesieur, Tr. Vol. III, pp. 40–44); Reznickov had no teaching experience, no recent experience in Russia, and was unable to speak Russian, Turkish or Arabic. Personal life experience was considered but was not written out as the precise qualification. Nevertheless, Lev Yudovich had the high score and still was not selected. (Testimony, Lesieur, Tr. Vol. III, p. 46; Defendant's Exhibit 92)

Plaintiffs, although they were fully qualified under the criteria as advertised, were passed over in favor of inferior candidates. (Testimony, Hen–Tov, Tr. Vol. I, pp. 202–203; Hassman, Tr. Vol. I, p. 60; Defendant's Exhibits 89, 92, 114)

Lev Yudovich worked 60 to 70 hours a week while employed at USARI. (Testimony, Thomas, Tr. Vol. I, p. 71) In addition to his other activities, Lev Yudovich was involved in developing "Monitor", a collection of recent Russian publications. In 1991, Thomas recommended that he receive an award for his development of "Monitor". However, the award was reduced to an "impact award", thereby reducing the dollar value to Lev Yudovich. Later, Kosevich decided to terminate the publication of "Monitor" even though it was being distributed to forty or fifty government agencies. (Testimony, Thomas, Tr. Vol. I, p. 87)

The U.S. Inspector General's Report of Inquiry, dated, August 14, 1991, found: that the USARI command climate was inconsistent with Army standards; that USARI officials refused to return personal correspondence properly belonging to its employees in a timely manner; that USARI officials improperly searched desks and filing cabinets of faculty members to seek correspondence and property related to employee misconduct (Plaintiffs' Exhibit B, pp. 5, 9) Several findings of the IG Report and Discrimination Investigation follow:

Carlson discriminated against Russians and Jews. Although Kosevich didn't believe that Carlson was discriminatory he withdrew Irene Yudovich's 1989 termination. (Testimony, Irene Yudovich, Tr. Vol. I, p. 265; Kosevich, Tr. Vol. III, p. 256)

After Carlson became chief of the Russian Language Division, only three persons of the Jewish faith were hired: plaintiffs Irene and Lev Yudovich, and Naumov. All three were terminated by Kosevich.

Carlson, Mahlum and Kosevich testified that their personnel actions were necessary. They retaliated against Naumov, a witness to an incident in which Hen–Tov was threatened by Carlson. (Plaintiffs' Exhibit B, p. 11)

Both Carlson and Kosevich retaliated against Naumov; they lied when they terminated him, and lied to the Inspector General. (Plaintiffs' Exhibit B, pp. 4, 5)

Government agencies of the U.S. have determined that USARI management had retaliated against faculty members who offered evidence of hostile environment at USARI. (Plaintiffs' Exhibits AQ, AR, AS)

Carlson kept a Nazi beer mug with a swastika prominently displayed in public view in his office. (Testimony, Lev Yudovich, Tr. Vol. II, p. 71)

Carlson referred to Faculty Members of Soviet origin as "you Sovs", which was meant in a derogatory manner. On two occasions he said that he hated Sovs. (Testimony, Pavlova, Tr. Vol. II, p. 15) In the spring of 1989, he said they were aggressive, lazy, nontrustworthy, and that he had to watch every

move they made. (Testimony, O'Neill, Tr. Vol. I, pp. 101–102)

Carlson told the Army investigators that he had a low opinion of Soviets. He considered them to have a low work ethic, to be prone to intrigues, to be uncooperative and untrustworthy and he felt they had to be watched closely. (Plaintiffs' Exhibit A, p. 6)

In May of 1989 USARI hired Svetlana Fradis, a Russian emigre. Carlson admitted telling Larry Pohl, Fradis' supervisor, that he was glad that Fradis was not Jewish. (Plaintiffs' Exhibit A, p. 5)

Plaintiff Irene Yudovich organized and ran a drama club at USARI, which Carlson closed down. Carlson admitted that he misrepresented Mrs. Yudovich's involvement in establishing a student drama club to Kosevich. (Plaintiffs' Exhibit B, p. 8)

On September 29, 1989, at 4 a.m., Carlson entered Haskins' office, and after conducting a search, found a letter to Senator Helms, which in turn referenced the letter to Senator Nunn. (Plaintiffs' Exhibit B) [2]

The U.S. Army's Inspector General's report (Plaintiffs' Exhibit B) contains testimony of Carlson in which he stated regarding the Russian people:

"I'm right, you're wrong. Russians like it simple. Russians love it simple ... These Russians, you've got to keep up on them all the time, yea, I probably said something like that. Is that discriminatory? No! But you've got to remember we are dealing with a different culture. There are, you know, ways you should be expected to act interface with that culture. It certainly does not mean they are discriminatory. You know, you have to be firm because if you are not in dealing with the Russian culture, the Russians immediately encroach to assume, you know, anything that is perceived as weakness, a Russian will push on that point to establish himself on what he wants from the system." (Plaintiffs' Exhibit B, p. 8)

The report also reflected that Kosevich felt that Russia was a racist society. (Testimony, Kosevich, Tr. Vol. IV, p. 11)

In addition, Captain Roman, USARI Adjutant General, told the IG that, the "Russian faculty behaved like children, had problems with values, and when dealing with these people, I did not know when they were telling the truth". (Plaintiffs' Exhibit B, p. 6)

Kosevich also told the IG that a faculty member asked whether USARI was a "Russian institute or a Jewish institute", and admitted he made no statement of reprisal or response to this remark. (Defendant's Exhibit 108)

In October of 1989, Defendant Secretary Michael P.W. Stone visited USARI and asked Kosevich how many Jews were employed at USARI. Kosevich replied that he did not know. (Testimony, Kosevich, Tr. Vol. IV, p. 9)

Furthermore, Thomas heard Carlson state "I will get Mrs. Yudovich". (Testimony, Thomas, Tr. Vol. I, p. 85)

Kosevich wanted to change the curriculum at USARI to require an element of recent Soviet life and professional experience. (Testimony, Kosevich, Tr. Vol. III, p. 245, 246) Kosevich wanted to employ instructors under temporary contract appointments enabling them to hire recent emigres who were easily familiar with life and current affairs in the former Soviet Union and Eastern Europe.

Lastly, the report reflected that starting in 1991, there were six Jewish members of the USARI faculty: Fy Chechinski, Steven Hassman, Hen–Tov and plaintiffs were GS employees whose appointments were subject to extension by Kosevich. Kosevich personally directed each of these appointments not to be extended. The sixth, Natalie Hassman, was an LN employee in the summer of 1990, and she was asked by a subordinate of Kosevich to justify her continued employment at

---

**2.** Carlson and Kosevich used the services of informers to keep track of USARI employees in the Russian language division. One such informer was Valery Golovko. (Plaintiffs' Exhibit A; Plaintiffs' Exhibit B, p. 8; Testimony, Golovko, Tr. Vol. III, pp. 176–179) Several faculty members complained to Senators Nunn and Helms about the treatment at USARI. (Plaintiffs' Exhibit AL) Carlson heard of those letters of complaint through an informer. (Plaintiffs' Exhibit B)

USARI. (Testimony, Hassman, Tr. Vol. II, p. 4)

## II.

### DISCUSSION

The Court has little difficulty in reaching a conclusion that USARI was permeated with an anti-Semitic and anti-Russian atmosphere.[3] Major Carlson made a number of anti-Semitic and anti-Russian comments. He referred to "the Sovs" in a derogatory manner and also kept a coffee mug displaying a Swastika in plain view in his office. The Court also has little problem in concluding that the findings in the Inspector General's reports (Plaintiffs' Exhibits A, B) are borne out by the record of the trial in this Court. In fact, the government conceded in final argument that Carlson was anti-Semitic. The Court finds that Colonel Kosevich, although he is part Russian, also harbored anti-Semitic and anti-Russian feelings. He was known to support Carlson when complaints came in from the faculty relating to their mistreatment by Carlson. (Plaintiffs' Exhibit AK)

Carlson was described as a workaholic; a very precise person, who was a tough taskmaster and demanded a great deal from the faculty. Irene Yudovich was described as a person who was occasionally hard to get along with and who wanted to do things her way. While one could argue that there was a personality clash between the two of them, it is clear that the invectives and the anti-Russian and anti-Semitic comments were made because Carlson disliked Russians and Jews.

In many discrimination cases the Court has to draw inferences from the evidence. It is rare that the Court has a smoking gun to illustrate discrimination. In this case, Carlson is a smoking platoon of weaponry illustrating the anti-Semitic and anti-Russian atmosphere. Kosevich hitched his star and backed Carlson without doing an investigation; he did not believe Carlson acted in a discriminatory manner. Kosevich had the discretion to extend plaintiffs' appointments beyond the two-year period but did not do so. The anti-Semitic feelings of Kosevich became evident in November of 1989 when he beat his head in mockery of Lev Yudovich's reaction to Irene's termination. The record of this case reeks with anti-Semitic and anti-Russian feelings. The discrimination appears also in the failure of the Army to hire the plaintiffs as contract employees. The Court finds the inquiries made by the defendant, Secretary Michael P.W. Stone, to Kosevich on a visit to USARI in October of 1989

---

3. Evidence of discrimination against plaintiffs:

A. Religion and national origin was discussed with Colonel Stoval. He said it was difficult to work with all these Russians and Jews. (Testimony, French, Tr. Vol. I, p. 34)

B. Carlson said "If I get to be in charge, some instructors will go". (Testimony, Thomas, Tr. Vol. I, p. 65)

C. Thomas was present at a meeting with the plaintiffs and Gross in which plaintiffs were advised that their jobs were out for bid and no promises made. No mention was made of the 2 year NTE appointment. (Testimony, Thomas, Tr. Vol. I, p. 67)

D. When plaintiffs became U.S. citizens, Carlson said "their status has changed, and I can get them now". (Testimony, O'Neill, Tr. Vol. I, pp. 106–107)

E. In 1991, when plaintiffs were terminated, they were not replaced. In 1990, Wilhide said that he needed to nationalize the organization, the faculty was too old, he needed fresh blood. (Testimony, Hen–Tov, Tr. Vol. I, p. 193)

F. Carlson said on two occasions that he hated "Sovs". (Testimony, Pavlova, Tr. Vol. II, p. 15)

G. Major Lechliter referred to the Plaintiffs by saying "we want to get everything from you because you will soon retire, and we will be left with nothing." (Testimony, Irene Yudovich, Tr. Vol. II, p. 124)

H. Kosevich had a policy of no extensions of NTE employees because he wanted fresh ideas. However, Fradis was extended by Colonel Prokopowicz. (Testimony, Wai, Tr. Vol. II, p. 146)

I. Prokopowicz decided to extend everyone; including Fradis, Golovko, Grenewitz and Hen–Tov. (Testimony, Wai, Tr. Vol. II, p. 151)

J. Colonel Crutcher had a policy to extend everyone on the tour of duty up to about four years. (Testimony, Wai, Tr. Vol. II, p. 152)

K. Wells testified that he was aware of the plaintiffs' complaint when they rated the candidates in 1992. The candidates were Reznickov, Novakov, and Fedotov. Reznickov is Jewish. (Testimony, Wells, Tr. Vol. II, pp. 243, 244)

L. Wells gave Fedotov points for military translation or interpretation of Russian translation, which was not the same credit. Fedotov should have been given 20 points for interpreting instead of 30 points. (Testimony, Wells, Tr. Vol. III, p. 8)

very disturbing. Stone asked Kosevich how many Jews were at USARI.

The Court finds for the record that Lev and Irene Yudovich certainly have shown religious and national origin discrimination as well as retaliatory conduct. However, the Court finds that they have not made their case of age discrimination or proved that age was a factor in their termination. Accordingly, the Court finds in favor of the plaintiffs.

### III.

Plaintiffs have filed their complaint asking for relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 633a. Defendant has denied discrimination and further alleges that plaintiffs are merely disappointed bidders who applied for the contractor positions.

### National Origin and Religion

█  In order for the plaintiffs to prevail in their Title VII action and the Age Discrimination action, the Court must first find that they have proved a prima facie case of discrimination by a preponderance of the evidence. As used in the Title VII context when no direct evidence is shown, the phrase "prima facie case" refers to the "establishing of a legally mandatory, rebuttable presumption" rather than the presentation of enough evidence to permit the trier of fact to reach a conclusion. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

█  The most often used test for determining whether plaintiff has proved a prima facie case for discrimination is set forth in *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). This test permits the plaintiff to establish a prima facie case by proving "(i) that he belongs to a [protected] minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications".

█  Once the plaintiff has stated a prima facie case, the burden shifts to the defendant to introduce some admissible evidence showing a legitimate non-discriminatory reason for its challenged action. Defendant need not prove that it was actually motivated by the proffered reason. *See, e.g., Texas Department of Community Affairs v. Burdine, supra; Board of Trustees of Keene College v. Sweeney,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

█  Finally, if the defendant is able to satisfy this burden, the burden then shifts once again to the plaintiff to prove that the defendant's stated reason for his or her termination, if that be the case, was not the real reason, and was merely a pretext for unlawful discrimination. *Blue v. United States Dept. of the Army,* 914 F.2d 525, 536 (4th Cir.1990), *cert. denied sub nom. Chambers v. United States Dept. of the Army,* 499 U.S. 959, 111 S.Ct. 1580, 113 L.Ed.2d 645 (1991); *accord Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095–96; *McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. at 1826.

█  It is well-settled that the *McDonnell Douglas* model is appropriate in those cases in which no direct evidence of discriminatory motive exists. Where there is such direct evidence, however, it is inappropriate to invoke the model. *Wilhelm v. Blue Bell, Inc.,* 773 F.2d 1429, 1434 (4th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 239, 240 (4th Cir.1982); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1018 (1st Cir.1979). In the face of direct evidence of discriminatory motive the employer cannot escape liability merely by producing a plausible explanation for its conduct. Rather, as in any other case in which there is direct evidence, to escape liability the employer will have to prove by preponderant evidence that either (1) it was not biased towards the plaintiff; or (2) that its actions towards the plaintiff were not affected by this bias.

This Court finds that the plaintiffs have shown such direct evidence of discriminatory motive in relation to the claims of national origin and religious discrimination.

In this case, the plaintiffs have proven that they are a protected minority, to-wit, Russian–Jewish emigres; that they were qualified for the position for which they applied; and that they were denied the position on the basis of their religion and national origin. As shown by the evidence, there is direct evidence of bias. The investigations conducted by the defendant show numerous instances of anti-Russian and anti-Semitic sentiments and conduct by plaintiffs' superiors. Carlson expressed Russian hostility by various invectives made to the faculty members and expressed Jewish hostility by, among other things, keeping a coffee mug with a swastika on his desk. When Carlson's superior, Kosevich, was confronted with the complaints about hostility, his response was to back Carlson and not seriously consider the complaints.

The anti-Semitic and anti-Russian conclusions are supported by the reports of the Inspector General. The trial record bears out the reports of ethnic and religious racism.

The defendant employer has failed to show that it was not biased towards plaintiffs. Quite to the contrary, the defendant admitted religious bias towards the plaintiffs in closing argument. The defendant employer has also failed to show that its actions towards the plaintiffs were not affected by the bias.

### Retaliation

▬ Plaintiffs claim that defendant retaliated against them for having filed a claim with the EEOC by failing to extend their appointments and by denying them contract positions for which they were qualified. The sequence of proof and assignment of burdens set forth in *McDonnell Douglas* and *Burdine* also apply to claims of retaliatory conduct. To prove a prima facie case of retaliation, the plaintiff must show: (1) that he/she engaged in a protected activity; (2) that his/her employer took adverse employment action against him/her; and (3) that a causal connection existed between the protected activity and the adverse action. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985).

It is clear that plaintiffs have proved a prima facie case of retaliation. The Inspector General's documents show the tendency of USARI management to retaliate against any faculty or military personnel providing evidence of the true environment at the USARI institute. The findings include: "the termination of Mr. Naumov for contradicting a description of his testimony; threats to the faculty at large and characterizing their complaints as 'subversion'; and threatening a military officer, Major Thomas, who appears to be guilty of no more than refusing to deny hearing evidence against Carlson." These findings are supported by the findings of two different agencies, the Merit Systems Protection Board and the Office of Special Counsel, each of which has found USARI guilty of retaliating against employees who offer evidence against the faculty.

Plaintiffs were appointed to terms of two-year limited appointments, NTE. Reference to "NTE" does not appear in any of the documents submitted to plaintiffs when they applied, and plaintiffs specifically stated in their applications that they would not accept "temporary appointment type positions." Furthermore, plaintiffs were issued three-year identity cards. The Court finds that employees who were appointed to two or three year appointments were routinely extended by USARI. Kosevich had the discretion to extend plaintiffs' appointments but chose not to extend them. Non–Jewish faculty members with experience similar to plaintiffs were hired and extended by USARI in the 1989–1991 time period.

Defendant has failed to show that plaintiffs were terminated under the terms of their appointments. Defendant has failed to show that the plaintiffs lacked the kind of experience that was desired at the USARI faculty. While defendant was trying to reduce the faculty in October of 1990, USARI was hiring faculty into Irene Yudovich's division, and after her departure USARI continued to hire faculty members to perform these duties.

Consequently, USARI actually increased the number of faculty.

■ The Court finds that while the sole reason advanced by defendant for not selecting Lev Yudovich was his purported lack of experience in the Soviet Union within five years prior to his application, Lev Yudovich had such experience, and USARI knew he had such experience. With respect to Irene Yudovich, she was credited with recent experience but was improperly denied credit for experience within USARI. Accordingly, the Court finds that the denial of plaintiffs' contract applications constitutes illegal reprisal in violation of Title VII.[4]

The Court easily concludes that plaintiffs have met the burden of proving discrimination and reprisal. Defendant denies discrimination and alleges that plaintiffs created their own problems. It is difficult to understand defendant's position in this case, when it conceded in final argument that Carlson was anti-Semitic. The Court rules that the defendant has not met its burden of proving that the non-extension or the non-selection of plaintiff was due to legitimate non-discriminatory reasons.

### Age Discrimination

■ Plaintiffs have also brought an action for relief under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 633a. To recover under this Act, the plaintiff must establish that "but for" his/her age, defendant would not have taken action against plaintiff. *EEOC v. Clay Printing Co.*, 955 F.2d 936, 940 (4th Cir. 1992); *Spagnuolo v. Whirlpool Corporation*, 641 F.2d 1109, 1111–12 (4th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981); *Lovelace v. Sherwin Williams Co.*, 681 F.2d 230, 238 (4th Cir.1982).

Plaintiffs may establish this motivational element by either of two methods. First, he/she may use the judicially created proof scheme common to disparate treatment discrimination actions. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). Alternatively, he may prove an intent to discriminate by the traditional method of direct or circumstantial evidence. *Lovelace*, 681 F.2d at 239.

■ It is well-settled that in order to make out a prima facie case of age discrimination by either method, a plaintiff must present some objective evidence, either direct or circumstantial, of age discrimination. A plaintiff's "own naked opinion, without more, is not enough to establish a prima facie case ..." *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir.1988).

Plaintiffs' evidence does not have the probative force to create an inference of discriminatory animus. The strongest plaintiffs' case gets is evidence of a statement by Colonel Lechliter in which he said, "We want to get everything from you because you will soon retire and we will be left with nothing." (Testimony, Irene Yudovich, Tr. Vol. II, p. 124) Plaintiffs have failed to show that but for their age they would not have been terminated.

The Court further finds the Government's argument that the plaintiffs were disappointed bidders to be non-persuasive; accordingly, the motion to dismiss plaintiffs' contract claim is denied.

### CONCLUSIONS OF LAW

1. Plaintiffs bring this complaint pursuant to Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. § 2000e et seq. (National Origin, Religion and Reprisal) and the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 633a. Accordingly the Court has jurisdiction to hear this case.

---

**4.** Although Title VII protects only "employees" from discrimination and reprisal, and plaintiffs were not "employees" when they applied for the contractor positions at issue, it is established that reprisal by an employer against a former employee based upon incidents arising during the employer/employee relationship is actionable under Title VII. *Rutherford v. American Bank of Commerce*, 565 F.2d 1162, 1165–66 (10th Cir.1977); *Shehadeh v. C & P Telephone Co.*, 595 F.2d 711, 721 n. 50 (D.C.Cir.1978).

2. Plaintiffs have proven their claims of discrimination on the basis of national origin and religion and reprisal.

3. Plaintiffs have failed to prove their claim of age discrimination.

An appropriate order shall issue.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is accordingly ORDERED:

(1) that judgment is entered in favor of the plaintiffs Lev Yudovich and Irene Yudovich and against the defendant Michael P.W. Stone, Secretary of the Army, on their claims of discrimination on the basis of national origin, religion and reprisal.

(2) that judgment is entered in favor of the defendant Michael P.W. Stone, Secretary of the Army, on plaintiffs' claim of age discrimination.

(3) that plaintiffs shall submit their brief in support of remedies, counsel fees and costs within twenty (20) days of the entry of this Order. Defendant shall file his opposition within forty (40) days of the entry of this Order.

(4) that the Clerk shall forward copies of this Order to all counsel of record.